119 T.C. No. 4

UNITED STATES TAX COURT

EDWARD A. ROBINSON III AND DIANA R. ROBINSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9574-99.            Filed September 5, 2002.

       P-H operated a law practice as a sole proprietorship at
all relevant times.  R audited Ps' 1987 joint tax return and
made several adjustments to the Schedules A and C attached
to this tax return.  Ps agreed to R's adjustments and the
resulting deficiencies and additions to tax.  In 1994, R
seized real property that Ps owned; in 1995, R sold the
property and applied the proceeds to Ps' underpayment of
their 1987 income tax liability and interest thereon.  On
Schedule C of their 1995 joint tax return, Ps deducted the
1987 underpayment interest that had been thus paid.

       1. <u>Held</u>: Insofar as sec. 1.163-8T, Temporary Income Tax
Regs., 52 Fed. Reg. 24999 (July 2, 1987), and sec. 1.163-
9T(b)(2)(i)(A), Temporary Income Tax Regs., 52 Fed. Reg.
48409 (Dec. 22, 1987), apply under the circumstances herein
to characterize the 1987 underpayment interest thus paid in
1995 as not being "interest * * * on indebtedness properly
allocable to a trade or business" within the meaning of sec.

163(h)(2)(A), I.R.C. 1986, and therefore as not being deductible under ch. 1, I.R.C. 1986, these regulations are valid.

2. Held, further, Redlark v. Commissioner, 106 T.C. 31 (1996), revd. and remanded 141 F.3d 936 (9th Cir. 1998), will no longer be followed.

3. Held, further, Ps are not entitled to deduct the interest they paid in 1995 on account of the underpayment of their 1987 income tax liability.

Charles B. Sklar[1], for petitioners.

Joseph Ineich, for respondent.

CHABOT, Judge: Respondent determined a deficiency in Federal individual income tax for 1995 against petitioners in the amount of $29,879.[2] The issue for decision is whether petitioners may deduct for 1995 the interest they paid in 1995 on their 1987 Federal individual income tax underpayment.[3]

---

[1] Cheryl R. Frank and Gerald W. Kelly, Jr., appeared on petitioners' behalf at the trial. A few months later, before filing any briefs, they moved for leave to withdraw as counsel; the Court granted their motion. Later Charles B. Sklar entered his appearance and thereafter represented petitioners on brief.

[2] Of this total, $28,015 is income tax under ch. 1 and $1,864 is self-employment tax under ch. 2.

Unless indicated otherwise, all section and chapter references are to sections and chapters of the Internal Revenue Code of 1986 as in effect for 1995. The section references in table 1, infra, are to this Code as in effect for 1987.

[3] Respondent disallowed petitioners' $69,617 deduction of
(continued...)

FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

Petitioners Edward A. Robinson III (hereinafter sometimes referred to as Edward), and Diana R. Robinson resided in Louisiana when they filed their petition in the instant case.

A. Edward's Background

In 1970, Edward was graduated from Grambling State University, cum laude, with a double major in political science and English. In 1971, Edward received a master's degree in criminal jurisprudence from the State University of New York at Albany. In 1975, Edward received his law degree from Rutgers University. Edward also was awarded an honorary LL.D. from World University, in Tucson, Arizona.

After his Rutgers graduation, Edward worked as the chief administrator of the Louisiana Justice Department. Edward

---

[3](...continued)
"other interest" that was reported on the Schedule C (Profit or Loss From Business) attached to their 1995 tax return. The $69,617 interest payment was made in respect of petitioners' underpayment of their 1987 Federal individual income tax liability. The other adjustments that respondent made to petitioners' 1995 return were to petitioners' Schedule A (Itemized Deductions) and to the computation of the self-employment tax deduction and the self-employment tax liability for Edward A. Robinson III. These adjustments are computational; their resolution depends on our determination of the issue for decision.

resigned from this position and opened his own law practice in 1979. Edward's law practice focused almost exclusively on personal injury cases. At all relevant times, Edward's law practice was operated as a sole proprietorship.

B. 1987 Return and Audit Thereof

During 1989, respondent audited petitioners' 1986 and 1987 joint tax returns.[4]

On their 1987 tax return, petitioners reported $6,274 interest income and $60,677 net profit from Edward's law practice. On the 1987 Schedule C, petitioners reported $388,000 gross receipts, $18,500 cost of goods sold, and $308,823 deductions, leading to the $60,677 net profit. On the 1987 Form 1040, petitioners reported $3,866 chapter 1 income tax, $5,387 chapter 2 self-employment tax, $502 addition for underpayment of estimated tax, and no withholding or other payments, for a total of $9,755 owed. Petitioners timely paid this $9,755.

Respondent proposed adjustments to petitioners' 1987 taxable income, and a deficiency and additions to tax as shown in table 1.

---

[4] We do not make further findings as to 1986 because the parties have stipulated that the $69,617 item which is the basic adjustment in the instant case is entirely interest on the underpayment of petitioners' 1987 tax liability.

Table 1

| Item | Amount |
| --- | --- |
| Unreported income[1] | $25,377.81 |
| Sched. C adjustments--net | 195,715.95 |
| Sched. A adjustment-- consequential[2] | 6,389.00 |
| Sched. A adjustments--other | (658.59) |
| Deficiency | 83,632.30 |
| Addition--sec. 6653(a)(1)(A) | 4,181.62 |
| Addition--sec. 6653(a)(1)(B) | [3] |
| Addition--sec. 6661 | 20,908.08 |

[1] All of the unreported income was from Edward's law practice.

[2] Reduction in medical expense deduction, resulting from increase in adjusted gross income because of additional income from Edward's law practice.

[3] Fifty percent of the interest on $83,632.30.

Petitioners agreed to these proposed changes, and the appropriate amounts were assessed.

Respondent seized certain of petitioners' property in 1994, sold the property in 1995, and in 1995 applied $69,617 of the proceeds to petitioners' interest on the underpayment of their 1987 tax liability.

The $69,617 interest payment was not related to any liability on petitioners' 1987 tax return as originally filed, as all such liability had been timely paid. This interest payment

was applied only to interest assessed as a result of the 1987 audit deficiency in tax and additions. Petitioners deducted this $69,617 as "Interest: * * * Other" on line 16b of the Schedule C (Edward's law practice) on their 1995 tax return.

On their 1995 tax return, petitioners reported $359,915 net profit from Edward's law practice (Sched. C), $1,410 royalty income (Sched. E), and a $1,702 loss on sales of business property (Form 4797). On the 1995 Schedule C, petitioners reported $523,480 gross receipts, $26,340 cost of goods sold, and $137,225 deductions (including the disputed $69,617 other interest item), leading to the $359,915 net profit. On the 1995 Form 1040, petitioners reported $108,735 chapter 1 income tax, $17,228 chapter 2 self-employment tax, $59 addition for underpayment of estimated tax, and $110,000 estimated tax payments, for a total of $16,022 owed.

_____

The $69,617 was interest paid in 1995, but it was not on indebtedness properly allocable to Edward's law practice, petitioners' only relevant trade or business.

OPINION

A. The Parties' Contentions

The parties focus their dispute on whether section 163 prohibits allowance of petitioners' claimed $69,617 Schedule C

interest deduction; in particular whether the interest is "on indebtedness properly allocable to a trade or business", within the meaning of section 163(h)(2)(A), and therefore exempt from the general disallowance rule of section 163(h).

Petitioners contend that the $69,617 interest qualifies for the exemption from the disallowance rule and that a regulation to the contrary is invalid, relying on this Court's opinions to that effect. In the alternative, they contend that the regulation is not an authoritative interpretation of the applicable statutory language, the regulation having been issued before the statutory language was enacted.

Respondent relies on the regulation as an authoritative interpretation of an ambiguous statute and notes that the Courts of Appeals of five different circuits have come to the same conclusion. As to the prior opinions on which we relied in invalidating the regulation, respondent's brief states that "It is therefore respondent's position that pre-section 163(h) case law is irrelevant to the resolution of the instant case." In the alternative, respondent contends that, if we were to conclude "that deficiency interest attributable to a trade or business is deductible, then an allocation of the deficiency interest in this case to the Schedule C adjustments and to the Schedule A adjustments for the 1987 year, will be required."

Neither side contends that we should distinguish between the factual settings presented in our two prior opinions on this subject. Apart from respondent's alternative contention as to the 1987 Schedule A adjustments, respondent apparently accepts that, if the regulations are not valid, then the interest expense resulting from the 1987 Schedule C adjustments is properly a 1995 Schedule C deduction.

B. Summary of Conclusions

We agree with respondent's primary position and much of respondent's analysis.

Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business"; this includes interest. Section 163(a) allows a deduction for "all interest paid or accrued within the taxable year on indebtedness"; this is allowed even if the interest would not be deductible under section 162(a). Notwithstanding this broad allowance language there are statutory limitations on amounts (e.g., sec. 163(d), relating to investment interest) and prohibitions (e.g., sec. 163(f), relating to registration-required obligations), that override not only section 163, but all of chapter 1 (sec. 163(d)(1)) or even "any other provision of law" (sec. 163(f)(1)).

In the instant case we focus on the prohibition in section 163(h)(1), prohibiting any deduction under chapter 1 for

"personal interest".  The Congress has defined this term comprehensively[5] in section 163(h)(2), so we focus on the specifics of the relevant part of the definition--"properly allocable to a trade or business" (sec. 163(h)(2)(A))--rather than concepts involved in "personal".

Examination of the history of the legislation, both the sequence of events and the formal explanations, does not lead to any clear answer as to the meaning of the finally adopted statutory language.  It is clear, however, that the Congress chose language different from the statutory language that had been construed in earlier cases.  This strongly suggests that the Congress intended a meaning different from the older statutory language, but it does not clearly indicate what the Congress intended that difference to be.

It is in this setting that we reach the Treasury Regulations--section 1.163-8T, Temporary Income Tax Regs., 52 Fed. Reg. 24999 (July 2, 1987), and section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., 52 Fed. Reg. 48409 (Dec. 22, 1987).[6]

---

[5]  That is sec. 163(h)(2) provides that "the term 'personal interest' means".  (Emphasis added.)  Compare secs. 64 and 65 ("the term * * * includes" (emphasis added)).

[6]  Sec. 6232(a) of the Technical and Miscellaneous Revenue Act of 1988 (TAMRA 1988), Pub. L. 100-647, 102 Stat. 3342, 3734-3735, added subsection (e) to sec. 7805.  Sec. 7805(e)(2) provides that "Any temporary regulation shall expire within 3 years after the date of issuance of such regulation."  Sec. 7805(e)(2) applies to any temporary regulation issued after Nov.

(continued...)

It is accepted that these regulations, if not invalid, would result in our concluding that interest on petitioners' 1987 underpayment of Federal income taxes is nondeductible personal interest.  We conclude that, taking into account the uncertainty as to the meaning of the statute, even as informed by the history of the legislation, these regulations constitute a permissible interpretation of the statute.  As a result, the regulations are not invalid, and so petitioners' claimed interest expense deduction is not allowed under chapter 1.

C.  Caselaw Setting of the Issues

We first addressed the validity of section 1.163-8T, Temporary Income Tax Regs., 52 Fed. Reg. 24999 (July 2, 1987), and section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., 52 Fed. Reg. 48409 (Dec. 22, 1987), in Redlark v. Commissioner, 106 T.C. 31, 34 (1996).  At that time, the Court of Appeals for the Eighth Circuit was the only Court of Appeals that had addressed the issue, and it concluded that section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., supra, is not invalid.  Miller v. United States, 65 F.3d 687, 691 (8th Cir. 1995).  With all due respect to the Court of Appeals for the Eighth Circuit, we concluded in Redlark v. Commissioner, 106 T.C. at 42, 47, that

---

[6](...continued)
20, 1988.  TAMRA 1988 sec. 6232(b), 102 Stat. at 3735.  The regulations herein involved were issued before Nov. 20, 1988, and thus the "sunset" provision of sec. 7805(e)(2) does not apply to these regulations.

both section 1.163-8T, Temporary Income Tax Regs., supra, and section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., supra, as applied to the facts presented in Redlark were unreasonable. Relying on Redlark v. Commissioner, supra, we held in Kikalos v. Commissioner, T.C. Memo. 1998-92, that the interest on the income tax deficiencies resulting from the operation of the taxpayer-husband's unincorporated trade or business was deductible under section 163(h)(2)(A) because the interest was properly allocable to the taxpayer-husband's unincorporated trade or business.

The Courts of Appeals for the Ninth and Seventh Circuits reversed our decisions in Redlark v. Commissioner, supra, and Kikalos v. Commissioner, supra, respectively, and held that section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., supra, is a reasonable interpretation of section 163(h). Kikalos v. Commissioner, 190 F.3d 791, 799 (7th Cir. 1999), revg. T.C. Memo. 1998-92; Redlark v. Commissioner, 141 F.3d 936, 942 (9th Cir. 1998), revg. and remanding 106 T.C. 31 (1996). The Courts of Appeals for the Fourth and Sixth Circuits also reached the same conclusion. McDonnell v. United States, 180 F.3d 721, 723 (6th Cir. 1999); Allen v. United States, 173 F.3d 533, 538 (4th Cir. 1999).[7]

---

[7] Although the Courts of Appeals for the Fourth and Seventh Circuits noted the application of sec. 1.163-8T, Temporary Income Tax Regs., 52 Fed. Reg. 24999 (July 2, 1987) (Allen v. United States, 173 F.3d 533, 537 (4th Cir. 1999); Kikalos v.

(continued...)

The Courts of Appeals uniformly relied on the following rationale to support their conclusions that section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., supra, is not invalid: (1) The regulation is not inconsistent with either the statute or its legislative history, and (2) the regulation is supported by the Staff of the Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1986 (J. Comm. Print 1987), hereinafter referred to as the 1986 Blue Book. Kikalos v. Commissioner, 190 F.3d at 798; McDonnell v. United States, 180 F.3d at 723 (adopting the rationale of Redlark v. Commissioner, 141 F.3d at 936); Allen v. United States, 173 F.3d at 537-538; Redlark v. Commissioner, 141 F.3d at 941; Miller v. United States, 65 F.3d at 690.

Although the judicial landscape surrounding section 163(h)(2)(A) has changed significantly since our decisions in Redlark v. Commissioner, supra, and Kikalos v. Commissioner, supra, the legislative landscape has not. Since section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., supra, was published in the Federal Register, Congress has not amended section 163(h)(2)(A) so as to compel a construction of section 163(h)(2)(A) contrary to the Secretary's construction as embodied

[7](...continued) Commissioner, 190 F.3d 791, 794 (7th Cir. 1999), revg. T.C. Memo. 1998-92), none of the cited Court of Appeals opinions specifically discussed the validity of this regulation.

in section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs.,
supra. The Courts of Appeals for the Fourth, Seventh, and Eighth
Circuits pointed to Congress's failure to amend section
163(h)(2)(A) as additional evidence that the regulation is
reasonable. Kikalos v. Commissioner, 190 F.3d at 799 (7th Cir.);
Allen v. United States, 173 F.3d at 538 (4th Cir.); Miller v.
United States, 65 F.3d at 690 (8th Cir.).

We have considered the opinions of the Courts of Appeals for
the Fourth, Sixth, Seventh, Eighth, and Ninth Circuits; those
opinions are entitled to all due respect. Lardas v.
Commissioner, 99 T.C. 490, 494 (1992). Appeal in the instant
case, however, lies to the Court of Appeals for the Fifth Circuit
which has yet to address the issue presented herein.[8]

---

[8] In Lardas v. Commissioner, 99 T.C. 490, 494-495 (1992),
we stated that, in Golsen v. Commissioner, 54 T.C. 742, 756-757
(1970), affd. 445 F.2d 985 (10th Cir. 1971), we

> reasoned that, where a reversal would appear
> inevitable, due to the clearly established position of
> the Court of Appeals to which an appeal would lie, our
> obligation as a national court does not require a
> futile and wasteful insistence on our view.

> \* \* \* \* \* \* \*

> It should be emphasized that the logic behind the
> Golsen doctrine is not that we lack the authority to
> render a decision inconsistent with any Court of
> Appeals (including the one to which an appeal would
> lie), but that it would be futile and wasteful to do so
> where we would surely be reversed. Accordingly,
> bearing in mind our obligation as a national court, see
> Lawrence v. Commissioner, \* \* \* [27 T.C. 713, 716-717

(continued...)

Accordingly, we proceed to reconsider our opinions in Redlark v. Commissioner, supra, and Kikalos v. Commissioner, supra.

We set forth the pertinent provisions of section 163(h).  We then trace the history of the enactment of these provisions, from Executive Branch proposals through the legislative process of the Tax Reform Act of 1986 (H.R. 3838, the Ways and Means Committee's "clean bill") and the retroactive amendments enacted in the Technical and Miscellaneous Revenue Act of 1988 (TAMRA 1988).  We then evaluate the status of the regulations.

D.  The Statute

Section 163(a) provides for the deductibility of all interest paid or accrued in the taxable year on indebtedness. The other subsections of section 163 provide limitations, particularized rules, or definitions with regard to the allowance

---

[8](...continued)
(1957), revd. on other grounds 258 F.2d 562 (9th Cir. 1958),] we should be careful to apply the Golsen doctrine only under circumstances where the holding of the Court of Appeals is squarely on point.  See Golsen v. Commissioner, supra at 757.

Two District Courts in the Fifth Circuit have concluded that section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., 52 Fed. Reg. 48409 (Dec. 22, 1987), is not invalid.  Fitzmaurice v. United States, 87 AFTR 2d 2001-654, 2001-1 USTC par. 50,198 (S.D. Tex. 2001); Davis v. United States, 71 F. Supp. 2d 622 (W.D. Tex. 1999).  Although these opinions are relevant to the instant case, they do not control because they are not Court of Appeals opinions.

rule of subsection (a).  As applicable to 1995, the year before

us, section 163(h) provides, in pertinent part, as follows:

SEC. 163.  INTEREST.

\*    \*    \*    \*    \*    \*    \*

(h) Disallowance of Deduction for Personal Interest.--

(1) In general.--In the case of a taxpayer other than a corporation, no deduction shall be allowed under this chapter [chapter 1, relating to normal taxes and surtaxes] for personal interest paid or accrued during the taxable year.

(2) Personal interest.--For purposes of this subsection, the term "personal interest" means any interest allowable as a deduction under this chapter other than--

(A) interest paid or accrued on indebtedness properly allocable to a trade or business (other than the trade or business of performing services as an employee),

(B) any investment interest (within the meaning of subsection (d)),

(C) any interest which is taken into account under section 469 in computing income or loss from a passive activity of the taxpayer,

(D) any qualified residence interest within the meaning of paragraph (3)), and

(E) any interest payable under section 6601 on any unpaid portion of the tax imposed by section 2001 for the period during which an extension of time for payment of such tax is in effect under section 6163 or 6166 or under section 6166A (as in effect before its repeal by the Economic Recovery Tax Act of 1981).

Petitioners contend that the interest they paid in respect

of their 1987 income tax underpayment falls within the terms of

section 163(h)(2)(A); they do not contend that their interest payment falls within the terms of any of the other subparagraphs of section 163(h)(2).  Accordingly, we focus on section 163(h)(2)(A).

E.  History of the Legislation (See Appendix infra.)

In November 1984, the Treasury Department issued a report to the President recommending numerous revisions of the tax laws. One of the proposals was designed to

> curtail the subsidy implicit in the [then] current law deduction of interest on debt to finance large amounts of passive, tax-preferred, investment assets (such as corporate stock) or extraordinary consumption expenditures (such as second homes).

In May 1985, President Reagan issued a report which included a proposal to subject "all interest not incurred in connection with a trade or business" to the section 163(d) limitations on investment interest.

The House bill followed the President's proposal in that it would impose a limit on deductibility of "nonbusiness interest". The latter term was defined to exclude "any interest which is allowable as a deduction in computing adjusted gross income". The Ways and Means Committee report stated that "Interest expense that is paid or incurred in carrying on a trade or business * * * is not subject to the interest deduction limitation under the bill."  H. Rept. 99-426 at 298, 1986-3 C.B. (Vol. 2) 1, 298.

The Senate amendment separated out the investment interest provisions (in a revised sec. 163(d)) and provided a prohibition (new sec. 163(h)) on deducting "consumer interest".  The latter term was defined to exclude "interest paid or accrued on indebtedness incurred or continued in connection with * * * the conduct of a trade or business".

The conference committee reached its agreement on August 16, 1986.  Thirteen days later, the staff of the Joint Committee on Taxation published a summary of the agreement, hereinafter sometimes referred to as the Joint Committee staff summary. Twenty days after that, the conference committee published its report.  Thirty-four days after that, the Tax Reform Act of 1986 was enacted.  The conference committee generally followed the Senate's approach, but changed the language to prohibit any deduction for "personal interest".  For our purposes, "personal interest" was defined the same way the Senate bill defined "consumer interest".  The Joint Committee staff summary stated as follows:

> Interest on underpayments of tax (other than certain deferred estate taxes) is treated as personal interest under the provision.

The conference committee explanation includes the following sentence:

> Personal interest also generally includes interest on tax deficiencies.

On May 4, 1987, the staff of the Joint Committee on Taxation published its "Blue Book", which included the following:

> Personal interest also includes interest on
> underpayments of individual Federal, State or local
> income taxes notwithstanding that all or a portion of
> the income may have arisen in a trade or business.
> * * *

On June 10, 1987, the chairman and ranking minority member of each of the tax-writing committees introduced bills to make technical corrections to TRA 1986. Each bill included the following:

> Subparagraph (A) of section 163(h)(2) of the 1986
> Code is amended by striking out "incurred or continued
> in connection with the conduct of" and inserting in
> lieu thereof "properly allocable to". [Sec. 105(c)(1)
> of H.R. 2636 and S. 1350.]

Each bill provided that the change was to take effect as though it had been included in TRA 1986. The Ways and Means Committee report stated that the change in section 163(h)(2)(A) is intended to make it consistent with the language of section 469, which also had been enacted in TRA 1986. The House of Representatives passed the provision as part of the 1987 Budget Reconciliation Act. The Finance Committee approved the same language and described it the same way in its report.

For reasons unrelated to this provision, the technical corrections were dropped from the Omnibus Budget Reconciliation Act of 1987, Pub. L. 100-203, 101 Stat. 1330. The same provisions were then introduced as part of the Technical

Correction Act of 1988, with the same effective dates and explanations, and ultimately enacted without change by the Technical and Miscellaneous Revenue Act of 1988 (TAMRA 1988), Pub. L. 100-647, 102 Stat. 3342.

The language thus enacted is what we must construe in the instant case.

## F.  Analysis of the Statute

From the foregoing, we draw the following conclusions.

### (1)  Initial Objectives

Although the movement to enact what became section 163(h) may have started with a concern about subsidizing already-tax-favored investments and "extraordinary consumption expenditures (such as second homes)" (infra Appendix 1.  The Treasury Report), the enacted statute is different--narrower in some respects and broader in others--from the original announced objectives.

It is not at all unusual for the Congress to act outside the confines of the problem described in the legislative history; the Congress has done so in many different areas of the tax law. See, e.g., Bartels Trust for Ben. of Univ. v. United States, 209 F.3d 147, 153-154 (2d Cir. 2000) (relating to charities' unrelated trade or business income); Corn Belt Tel. Co. v. United States, 633 F.2d 114, 117-118 (8th Cir. 1980) (relating to the definition of "public utility property" for investment credit purposes); Warrensburg Board & Paper Corp. v. Commissioner, 77

T.C. 1107, 1110-1111 (1981) (relating to subchapter S corporations' "one-shot" elections); Estate of Beal v. Commissioner, 47 T.C. 269, 271-272 (1966) (relating to includability of the value of certain annuities in decedents' estates).  Where the Congress has chosen to so legislate, the courts do not confine the statute to the original problem, but rather apply the statute to the net that the Congress has chosen to cast.

In light of the evolution of section 163(h) over the 4 years from the Treasury Report to TAMRA 1988, the original objective of the proposal cannot be taken as sufficiently explaining the meaning of section 163(h)(2)(A).

(2) The Varying "Handles"; Definition in the Statute

When the Congress enacts a definition of a term, the statutory definition controls over definitions in general dictionaries.

A review of the relevant history of the legislation reveals the varying phraseology that the Congress employed in the legislative process that culminated in the enactment of section 163(h)(2).  Five different terms, or "handles", were used to describe the interest, the deductions in respect of which the Congress wanted to either limit or disallow: "nonbusiness interest", "nonbusiness consumer interest", "consumer interest", "personal (consumer) interest", and "personal interest".  The

Congress also used varying definitions for these terms, e.g., "Interest expense that is paid or incurred in carrying on a trade or business" (H. Rept. 99-426 at 298, 1986-3 C.B. (Vol. 2) 1, 298), "interest paid or accrued on indebtedness incurred or continued in connection with--(i) the conduct of a trade or business" (H.R. 3838, sec. 1421 (as passed by the Senate), 132 Cong. Rec. at S 8921 (June 26, 1986)).

We make these observations because of the apparent focus on the question of whether interest paid in respect of an individual's Federal income tax liability is a "personal obligation". See Miller v. United States, 65 F.3d at 691, stating:

> that an individual's income tax liability, regardless of the nature of the income giving rise to the liability, is a personal obligation and that, consequently, interest owed by such individual because of a failure to pay his tax obligation on time necessarily is also a personal obligation.

See also Kikalos v. Commissioner, 190 F.3d at 797 (describing as reasonable the view taken by the Secretary therein that interest on income tax deficiencies is personal interest because the obligation to pay income tax is personal); Allen v. United States, 173 F.3d at 537 (stating: "Pursuant to these allocation rules, deficiency interest is allocable to the payment of income taxes, an expenditure that is purely personal in nature."); Redlark v. Commissioner, 141 F.3d at 941 (agreeing with the statement of the Court of Appeals for the Eighth Circuit (Miller)

"that personal income tax obligations are always essentially personal in nature"). Despite whatever logical conclusions may flow from the Congress's use of the term "personal interest", and the Congress's clearly expressed intention to end the deduction for indebtedness incurred to finance personal consumption expenditures, the instant case does not turn on whether the obligation to pay deficiency interest is a "personal obligation" or whether the payment of Federal individual income tax is a personal consumption expenditure. Indeed, the obligation to pay home mortgage interest is undoubtedly a "personal obligation", yet that type of interest expense is excluded from the definition of personal interest. Sec. 163(h)(2)(D). Moreover, as we noted in Redlark v. Commissioner, 106 T.C. at 42: "To conclude that an income tax deficiency is ipso facto a consumption expenditure begs the issue." Accordingly, the determination whether an item of interest is either a "personal obligation" or a "personal consumption expenditure" is not the talisman for purposes of applying section 163(h). Rather, the controlling inquiry, as framed by the statute itself, is whether the interest in issue is "properly allocable to a trade or business". Sec. 163(h)(2)(A).

When, as in the instant case, the Congress undertakes to define a term explicitly, "we must follow that definition, even if it varies from that term's ordinary meaning." Stenberg v. Carhart, 530 U.S. 914, 942 (2000); Guerrero-Perez v. INS, 242

F.3d 727, 736-737 (7th Cir. 2001); see, e.g. <u>Cherin v.</u>
<u>Commissioner</u>, 89 T.C. 986 (1987).  In other words, we are to
disregard the connotations of the term, or handle, that the
Congress adopts and instead focus on the language that the
Congress actually used to define the term.  This is especially
true where, as in the instant case, the Congress tells us what
the term in question "means".  "As a rule, 'a definition which
declares what a term 'means' . . . excludes any meaning that is
not stated.'"  <u>Colautti v. Franklin</u>, 439 U.S. 379, 392-393 n.10
(1979).  If, however, the statute in question uses the word
"includes" rather than "means" to define a term, then there is an
indication that the definition of the term is exemplary rather
than exclusive.  Sec. 7701(c); see <u>Winterrowd v. David Freedman</u>
<u>and Co., Inc.</u>, 724 F.2d 823, 825 (9th Cir. 1984)(citing <u>Highway &</u>
<u>City Freight Drivers v. Gordon Transports, Inc.</u>, 576 F.2d 1285,
1289 (8th Cir. 1978)).

In <u>Cherin v. Commissioner</u>, 89 T.C. at 1000-1001, we
addressed, inter alia, whether the taxpayer's deficiencies were
subject to a higher rate of interest under what was then (as to
interest accruing after Dec. 31, 1984) section 6621(c)[9], dealing
with interest on a substantial underpayment attributable to a
"tax-motivated transaction".  We found as facts in <u>Cherin v.</u>

---

[9] Sec. 6621(c) later was repealed by sec. 7721(b) of the
Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103
Stat. 2106, 2399.

Commissioner, 89 T.C. at 987, 988, 991, that the taxpayer (1) was looking for an investment which would produce significant income for his retirement years, (2) reasonably relied on the advice of his accountant, financial adviser, and attorney to enter into the disputed transaction (a tax shelter involving cattle breeding), and (3) contemplated that he would recover the purchase price of the two herds in which he invested. Despite these findings which suggested the presence of a profit motive, we concluded that the taxpayer's deficiencies were subject to the higher rate of interest under section 6621(c), i.e., that the taxpayer had a substantial underpayment attributable to a "tax-motivated transaction". Cherin v. Commissioner, 89 T.C. at 1001. We reached our conclusion in Cherin even though the handle the Congress chose, "tax-motivated transaction", suggested the importance of the taxpayer's motives. Instead of focusing on the connotations that logically flowed from that handle, we focused on the relevant statutory language, which set forth what the term "tax-motivated transaction" "means". Sec. 6621(c)(3).

In the instant case, in restricting the allowance rule of section 163(a), the Congress chose the term "personal interest", and the Congress told us what that term "means" in section 163(h)(2). As relevant herein, the term "personal interest" means "any interest allowable as a deduction under this chapter other than--* * * interest paid or accrued on indebtedness

properly allocable to a trade or business (other than the trade or business of performing services as an employee)".  Sec. 163(h)(2)(A).  Based on this definition of "personal interest" that the Congress set forth, the appropriate inquiry in the instant case is not whether petitioners' interest on their 1987 income tax deficiency is "personal" but whether it is "properly allocable to a trade or business".

(3) The Pre-TRA 1986 Cases

In Redlark v. Commissioner, 106 T.C. at 34-35, we opened our discussion of the law as it stood before enactment of TRA 1986 as follows:

> The question remains, however, whether the elements giving rise to the deficiencies to which the interest herein relates are of such a nature as to permit such interest to constitute a business expense within the meaning of section 162(a), and therefore of section 62(a), and, as a result, to be characterized as interest "on indebtedness properly allocable to a trade or business" within the meaning of section 163(h)(2)(A)[3] in the event that the temporary regulation is not applicable.  We think a review of the cases decided prior to the enactment of section 163(h)(2)(A), in respect of the deductibility of interest on income tax deficiencies as a business expense, will throw light on this question and is therefore a significant element in our analysis of the impact of that section on petitioners' claimed interest deduction.  It is to that review that we first turn our attention.

_____

[3] Sec. 163(h)(2)(A) was amended by sec. 1005(c)(4) of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3342, 3390.

Sec. 163(h)(2)(A), as originally enacted in 1986, provided:

(A) interest paid or accrued on indebtedness incurred or continued in connection with the conduct of a trade or business (other than the trade or business of performing services as an employee), [Tax Reform Act of 1986, Pub. L. 99-514, sec. 511(b), 100 Stat. 2085, 2246.]

The amended language, effective for the years in issue, was intended to conform the definition of personal interest to the language of the related passive loss and investment interest limitation provisions, to permit consistent application of a standard for allocation of interest. See S. Rept. 100-445, at 36 (1988); H. Rept. 100-795, at 35 (1988). There is no indication that the change in language was intended to make any substantive change in the meaning of the statutory language.

We then analyzed three opinions: Standing v. Commissioner, 28 T.C. 789 (1957), affd. 259 F.2d 450 (4th Cir. 1958); Polk v. Commissioner, 31 T.C. 412 (1958), affd. 276 F.2d 601 (10th Cir. 1960); Reise v. Commissioner, 35 T.C. 571 (1961), affd. 299 F.2d 380 (7th Cir. 1962). In each of these opinions we held that the interest on a tax underpayment was an ordinary and necessary expense "paid or incurred during the taxable year in carrying on any trade or business" within the meaning of section 23(a)(1)(A), I.R.C. 1939, the predecessor of section 162(a). In Standing v. Commissioner, 28 T.C. at 789-795, we also held that the interest on a tax underpayment was "attributable to" the taxpayer's trade or business within the meaning of section 22(n)(1), I.R.C. 1939, the predecessor of section 62(a)(1), hence deductible in arriving at adjusted gross income. In Polk v. Commissioner, 31 T.C. at 415, we noted that the net operating loss language in section 122(d)(5), I.R.C. 1939 (the predecessor of sec. 172(d)(4)), was

identical to the section 22(n)(1), I.R.C. 1939, language
construed in <u>Standing</u> and so should have the same meaning as in
<u>Standing</u>.  In <u>Reise v. Commissioner</u>, 35 T.C. at 579-580, we noted
that neither <u>Standing</u> nor <u>Polk</u> discussed our earlier opinion in
<u>Aaron v. Commissioner</u>, 22 T.C. 1370 (1954), in which we had held
that interest on a tax underpayment was not attributable to the
taxpayer's trade or business within the meaning of section
122(d)(5), I.R.C. 1939.  In <u>Reise</u> we thereupon overruled <u>Aaron</u>
and reaffirmed the position we took in <u>Polk</u> that the interest on
the tax underpayment was attributable to the taxpayer's trade or
business.

In <u>Redlark v. Commissioner</u>, 106 T.C. at 37, we then
summarized the effect of the foregoing cases as follows:

> Concededly there is some confusion in the reasoning of
> the decided cases, but the thrust of their bottomline
> conclusions is clear.  Exceptions will be accorded to the
> "ordinary and necessary" provision of section 162 only when
> there is explicit legislative indication that such a result
> was intended.  Thus, we agree with petitioners that there is
> a consistent body of pre-section 163(h) case law holding
> that, at least under limited circumstances such as were
> involved in <u>Standing v. Commissioner</u>, <u>supra</u>, <u>Polk v.
> Commissioner</u>, <u>supra</u>, and <u>Reise v. Commissioner</u>, <u>supra</u>,
> deficiency interest is a deductible business expense under
> section 162 and therefore under section 62(a)(1).  See
> Brennan & Megaard, "Deducting Interest on Noncorporate Trade
> or Business Tax Deficiencies: Uncertainty Exists Under the
> New Temporary Regulations", 13 Rev. of Taxn. of Individuals
> 22 (1989).

Later in our opinion in <u>Redlark v. Commissioner</u>, 106 T.C. at
43, we pointed out that

we have consistently been reluctant to conclude that Congress overruled existing case law when the statutory language does not compel such a conclusion and Congress has not otherwise expressly indicated that such a result should ensue. * * *

As we noted, supra, in H.R. 3838 as reported by the Ways and Means Committee, "nonbusiness interest" was defined to exclude "any interest which is allowable as a deduction in computing adjusted gross income". Proposed amendment to sec. 163(d)(3)(B) in sec. 402(a) of H.R. 3838 as reported by the Ways and Means Committee. If that language had been enacted, then our Redlark analysis of the statute would properly have led to the conclusion that interest on a tax underpayment under the circumstances of Redlark and the instant case would continue to be deductible under section 162 and that section 163 would not affect that deductibility, and that regulations to the contrary would be contrary to the statute.

However, that language was not enacted. See infra, Appendix. Instead, in TRA 1986 the Congress defined "personal interest" to exclude "interest paid or accrued on indebtedness incurred or continued in connection with the conduct of a trade or business". Sec. 163(h)(2)(A) (emphasis added). In TAMRA 1988 the Congress changed the language so as to exclude from personal interest "interest paid or accrued on indebtedness properly allocable to a trade or business." Sec. 163(h)(2)(A) (emphasis added). In Standing, Polk, and Reise, the critical statutory

language was "in carrying on any trade or business" (sec. 23(a)(1)(A), I.R.C. 1939) and "attributable to" the taxpayer's trade or business (secs. 22(n)(1) and 122(d)(5), I.R.C. 1939).

In Redlark v. Commissioner, 106 T.C. at 34, 37, we did not deal with the fact that both the enacted TRA 1986 language ("in connection with") and the enacted TAMRA 1988 language ("properly allocable to") were different from the "in carrying on" and "attributable to" language interpreted in the pre-TRA 1986 opinions.

Ordinarily, we would expect that a change in statutory language indicates a change in meaning. Russello v. United States, 464 U.S. 16, 23 (1983); cf. Elect. Arts, Inc. v. Commissioner, 118 T.C. 226, 242-243 (2002), and cases there cited.[10]

---

[10]  This is the general rule not only because of the authority of the cited opinions, but also because this is the way legislative drafters are instructed to draft statutes.  See, e.g., Office of the Legislative Counsel U.S. House of Representatives, House Legislative Counsel's Manual on Drafting Style, 3 (1995), as follows:

> (4) Use same word over and over.--If you have found the right word, don't be afraid to use it again and again.  In other words, don't show your pedantry by an ostentatious parade of synonyms.  Your English teacher may be disappointed, but the courts and others who are straining to find your meaning will bless you.

> (5) Avoid utraquistic subterfuges.--Do not use the same word in 2 different ways in the same draft (unless

(continued...)

Application of this general rule (if the statutory language is different, then it is presumed that the meaning is different) to the matter before us leads to the conclusion that section 163(h)(2)(A) means something different from the statutory provisions interpreted in the pre-TRA 1986 opinions.[11]

---

[10](...continued)
you give the reader clear warning).

To the same effect, see Dickerson, The Interpretation and Application of Statutes 224 (1975), quoted in Zuanich v. Commissioner, 77 T.C. 428, 443 n.26 (1981), as follows:

> [26] See R. Dickerson, The Interpretation and Application of Statutes 224 (1975), as follows:
>
> Because legal documents are for the most part nonemotive, it is presumed that the author's language has been used, not for its artistic or emotional effect, but for its ability to convey ideas. Accordingly, it is presumed that the author has not varied his terminology unless he has changed his meaning, and has not changed his meaning unless he has varied his terminology; that is, that he has committed neither "elegant variation" nor "utraquistic subterfuge". This is the rebuttable presumption of formal consistency. [Fn. refs. omitted.]

See also Hirsch, Drafting Federal Law, sec. 5.2 (3d ed. 1992).

[11] This presumption is rebuttable. In the TAMRA 1988 amendments, at every step in the enactment of the change from "incurred or continued in connection with the conduct of" to "properly allocable to" the Congress stated the intention that this was done to effectuate more clearly the original intention of TRA 1986 and not to change the meaning of the statute. See infra, Appendix. Consistent with these statements of congressional intent, the TAMRA 1988 amendments took "effect as if included in the provision of" the TRA 1986 to which the TAMRA 1988 amendments relate. See also Redlark v. Commissioner, 106 T.C. at 34 n.3. However, the parties have not directed our attention to, and we have not found, any evidence that either the
(continued...)

We do not intend in the instant case to overrule any of the three pre-TRA 1986 opinions--<u>Standing</u>, <u>Polk</u>, or <u>Reise</u>.  The statutory terms construed in those cases have been carried forward from the Internal Revenue Code of 1939 and now appear in section 162(a) ("paid or incurred * * * in carrying on any trade or business"), section 62(a)(1) ("attributable to a trade or business carried on by the taxpayer"), and section 172(d)(4) ("attributable to a taxpayer's trade or business").

However, the result of the Congress's decisions (1) to use different language in section 163(h)(2)(A) and (2) to provide in section 163(h)(1) that the disallowance rule overrode everything else in chapter 1, is that, as to the issue we cited them for in <u>Redlark</u>, the pre-TRA 1986 opinions have become irrelevant to the determination of chapter 1 tax liabilities.

(4)  The Conference Report, The 1986 Blue Book

In <u>Redlark v. Commissioner</u>, 106 T.C. at 42-45, we discussed the following sentence from the TRA 1986 conference committee explanation--

> Personal interest also generally includes interest on tax deficiencies

--with special focus on "generally" and "tax deficiencies".  We noted that "deficiency" is a term of art with a settled

---

[11](...continued)
enacted TRA 1986 language or the enacted TAMRA 1988 language was intended to have the same meaning as the language interpreted in the pre-TRA 1986 opinions.

definition. We interpreted the conference committee sentence as
follows (106 T.C. at 44-45):

> In short, we think that when the conference committee
> used the phrase "tax deficiencies", it was referring to
> amounts due by way of income, estate, and gift taxes. In
> this context, the word "generally" in the conference
> committee report takes on a significant meaning. It signals
> that not all interest relating to income tax, etc.,
> deficiencies are included in "personal interest". The
> logical explanation for what is excluded by "generally" is
> such interest that constitutes an ordinary and necessary
> business expense and is therefore "allocable to an
> indebtedness of a trade or business" within the meaning of
> the exception clause of section 163(h)(2)(A). To adopt
> respondent's position would require us to substitute the
> word "always" for "generally" and to expand the
> interpretation of the word "deficiencies" beyond its
> accepted meaning to encompass taxes other than income, etc.,
> taxes in order to account for the use of the word
> "generally". By way of contrast, our interpretation accepts
> the established meaning of "deficiencies" and gives effect
> to "generally" without modification.

We then discussed the 1986 Blue Book's status and concluded
as follows (106 T.C. at 45-46):

> Where there is no corroboration in the actual legislative
> history, we shall not hesitate to disregard the General
> Explanation as far as congressional intent is concerned.[7]
> See Estate of Wallace v. Commissioner, 965 F.2d 1038, 1050–
> 1051 n.15 (11th Cir. 1992), affg. 95 T.C. 525 (1990);
> Zinniel v. Commissioner, 89 T.C. 357, 367 (1987), affd. 883
> F.2d 1350 (7th Cir. 1989);[8] see also Livingston, supra at 93
> ("The Blue Book is on especially weak ground when it adopts
> anti-taxpayer positions not taken in the committee
> reports."). Given the clear thrust of the conference
> committee report, the General Explanation is without
> foundation and must fall by the wayside. To conclude other-
> wise would elevate it to a status and accord it a deference
> to which it is simply not entitled.

_____

[7] In this connection, we also note that the Tax Reform Act
of 1986, Pub. L. 99-514, 100 Stat. 2085, was enacted on Oct.
22, 1986, during the 99th Congress, whereas the General

Explanation was published on May 4, 1987, during the 100th Congress. Thus, the General Explanation is not even entitled to the respect it might otherwise be accorded if it had been prepared for the Congress which enacted sec. 163(h).

[8] See also Lawson v. Commissioner, T.C. Memo. 1994-286.

We conclude that there are several difficulties with the foregoing analysis in our opinion in Redlark v. Commissioner, 106 T.C. at 44-46. For the following reasons, we would not agree that the conference committee explanation has a "clear thrust".

Firstly, interest ordinarily is imposed on underpayments or overpayments, not on deficiencies. See, e.g., secs. 6601, 6611, 6621. There can be an income tax deficiency without an underpayment.[12] There can be an underpayment without an income tax deficiency.[13] In describing the amendments made by TRA 1986 sections 1511 (to sec. 6621, I.R.C. 1986) and 1512 (to sec. 6601, I.R.C. 1986), the Joint Statement of Managers portion of the conference committee report consistently refers to interest on underpayments or overpayments of tax, and it does not refer to interest on tax deficiencies. H. Conf. Rept. 99-841, at II-784 to II-785 (1986); 1986-3 C.B. (Vol. 4) at 784-785.

---

[12] See, e.g., Lundy v. Commissioner, T.C. Memo. 1993-278, revd. 45 F.3d 856 (4th Cir. 1995), revd. 516 U.S. 235 (1996), in which the parties agreed that the taxpayer had a $778 deficiency even though the taxpayer's withheld (and not refunded) income taxes exceeded his total tax liability.

[13] E.g., when a correct tax return is filed, but the payments are less than the correctly stated liabilities.

Thus, it is not clear whether the term "deficiency", to which we attributed such significance in Redlark v. Commissioner, 106 T.C. at 44-45, is merely an inadvertence in one portion of the conference committee report.

Secondly, the word "generally" may merely serve the function of alerting the reader that there is a category of interest on tax underpayments that does not fit into the definition of "personal interest"--to wit, the interest described in subparagraph (E) of section 163(h)(2), as follows:

> (E) any interest payable under section 6601 on any unpaid portion of the tax imposed by section 2001 for the period during which an extension of time for payment of such tax is in effect under section 6163 or 6166.[14] [Joint Committee staff summary at 18.]

Thirdly, the Joint Committee staff summary, published 20 days before the Conference Report, described the provision as follows:

> Interest on underpayments of tax (other than certain deferred estate taxes) is treated as personal interest under the provision.

Apart from the use of "underpayments" rather than "deficiencies", the Joint Committee staff summary appears to be completely consistent with the conference committee sentence on which we focused in Redlark v. Commissioner, 106 T.C. at 44-45--and quite inconsistent with the conclusion we drew in Redlark.

---

[14] The reference to sec. 6166 later was stricken by sec. 503(b)(2)(B) of the Taxpayer Relief Act of 1997, Pub. L. 105-34, 111 Stat. 788.

Fourthly, even if we were to agree that the use of "deficiencies" in the conference committee sentence is significant, the only significance stated in Redlark v. Commissioner, 106 T.C. at 44, is that it refers to "amounts due by way of income, estate, and gift taxes."[15] As we noted supra in Secondly and Thirdly, the exclusion provided by subparagraph (E) of section 163(h)(2) is an exclusion of interest on estate tax in certain circumstances. This is a far simpler explanation of the conference committee sentence than the labored explanation in Redlark; it provides consistency of meaning among the various documents in the history of the legislation; and it refutes the conclusion in Redlark v. Commissioner, 106 T.C. at 46, that the conference committee sentence has a "clear thrust" that requires us to reject the TRA 1986 Blue Book and to invalidate Treasury Regulations. Of course, if a Blue Book were to conflict with enacted language or controlling legislative history, then the statutory language or the controlling legislative history would prevail. In our view, the conference committee report is not clear regarding which category of interest was intended to be excepted from "personal interest"; i.e., which category made it

---

[15] Beginning with the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, the Congress began to bring a series of regulatory excise taxes into the definition of "deficiency" in sec. 6211. At the time TRA 1986 was enacted, the definition included the taxes imposed by chs. 41 through 45, in addition to the income, estate, and gift taxes imposed by subtits. A and B.

necessary to qualify the statement about personal interest with "generally". The Blue Book identifies another possible category besides interest on a deficiency arising in the case of a sole proprietorship, which contributes to the conclusion that the controlling legislative history's meaning is unclear.

(5) Conclusions From the Statute and the History of the Legislation

The relevant statutory language is not the term "personal interest", but the definitional term in subparagraph (A) of section 163(h)(2), in the context of the remaining elements of the definition. That definitional term differs from the statutory language construed in the three pre-TRA 1986 opinions relied on in Redlark, and so the meaning of that definitional term presumably is different from the meanings of the statutory language construed in those three opinions.

The relevant statutory language does not provide a clear answer to the dispute before us in the instant case.

The history of the legislation clearly shows an evolution in the Congress's thinking during the legislative process; it provides some support for the validity of the Treasury regulations, but that support is rebuttable. Apart from the analysis in Redlark, that history does not provide support for the conclusion that the Treasury regulations are invalid.

In this relatively inconclusive setting, we proceed to examine the Treasury regulations.

## G.  The Regulations

In the instant case, we consider the validity of the following regulations: (1) section 1.163-8T(c) and (c)(3)(ii), Temporary Income Tax Regs.,[16] 52 Fed. Reg. 24999 (July 2, 1987),

---

[16]  Sec. 1.163-8T(c)(1) and (c)(3)(ii), Temporary Income Tax Regs., supra, provides in pertinent part as follows:

Sec. 1.163-8T  Allocation of interest expense among expenditures (temporary).

(a) In General--(1) Application.  This section prescribes rules for allocating interest expense for purposes of applying sections 469 (the "passive loss limitation") and 163(d) and (h) (the "nonbusiness interest limitations").

\*     \*     \*     \*     \*     \*     \*

(c) Allocation of debt and interest expense--(1) Allocation in accordance with use of proceeds.  Debt is allocated to expenditures in accordance with the use of the debt proceeds and, * * *. * * * debt proceeds and related interest expense are allocated solely by reference to the use of such proceeds, and the allocation is not affected by the use of an interest in any property to secure the repayment of such debt or interest. * * *

\*     \*     \*     \*     \*     \*     \*

(3) Allocation of debt; proceeds not disbursed to borrower--* * *

\*     \*     \*     \*     \*     \*     \*

(ii) Debt assumptions not involving cash disbursements.  If a taxpayer incurs or assumes a debt in consideration for the sale or use of property, for services, or for any other purpose, or takes property subject to a debt, and no debt
(continued...)

and (2) section 1.163-9T(b)(2)(i)(A), Temporary Income Tax

Regs.,[17] 52 Fed. Reg. 48409 (Dec. 22, 1987).  See <u>Redlark v.</u>

_____

[16](...continued)
proceeds are disbursed to the taxpayer, the debt is treated
for purposes of this section as if the taxpayer used an
amount of the debt proceeds equal to the balance of the debt
outstanding at such time to make an expenditure for such
property, services, or other purpose.

[17] Sec. 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs.,
<u>supra</u>, provides as follows:

Sec. 1.163-9T Personal interest (temporary).

     \*    \*    \*    \*    \*    \*    \*

    (b) <u>Personal interest</u>--

     \*    \*    \*    \*    \*    \*    \*

    (2) <u>Interest relating to taxes</u>--(i) <u>In general</u>.  Except
as provided in paragraph (b)(2)(iii) of this section,
personal interest includes interest--

    (A) Paid on underpayments of individual Federal, State
or local income taxes and on indebtedness used to pay such
taxes (within the meaning of sec. 1.168-8T), regardless of
the source of the income generating the tax liability.

     \*    \*    \*    \*    \*    \*    \*

    (ii) <u>Example</u>.

    A, an individual, owns stock of an S corporation.  On
its return for 1987, the corporation underreports its
taxable income.  Consequently, A underreports A's share of
that income on A's tax return.  In 1989, A pays the
resulting deficiency plus interest to the Internal Revenue
Service.  The interest paid by A in 1989 on the tax
deficiency is personal interest, notwithstanding the fact
that the additional tax liability may have arisen out of
income from a trade or business.  The result would be the
same if A's business had been operated as a sole
proprietorship.

(continued...)

Commissioner, 106 T.C. at 40-42; see also supra note 6 (regarding the continuing vitality of these temporary regulations, notwithstanding section 7805(e)(2)).

(1) Standards for Judging Validity of Regulations

Section 1.163-8T, Temporary Income Tax Regs., supra, was promulgated under the authority of sections 469(l)(4)[18] and 7805, the basic regulation-prescribing authority for the Treasury Department.  T.D. 8145, 1987-2 C.B. 47, 50.  In the relevant Notice of Proposed Rulemaking, the Commissioner concluded that section 1.163-8T, Temporary Income Tax Regs., supra, is an interpretative regulation.  52 Fed. Reg. 25036 (July 2, 1987); 1987-2 C.B. 1053.  For purposes of the instant case, we agree with the Commissioner's conclusion and treat section 1.163-8T, Temporary Income Tax Regs., supra, as an interpretative regulation because the legislative delegation to the Secretary to

---

[17](...continued)
    Given the interaction between secs. 1.163-8T and 1.163-9T, Temporary Income Tax Regs., supra, and the fact that there is no sec. 1.168-8T, Temporary Income Tax Regs., it appears that the reference to sec. 1.168-8T, Temporary Income Tax Regs., supra, in sec. 1.163-9T(b)(2)(i)(A), supra, should be to sec. 1.163-8T, Temporary Income Tax Regs., supra, instead.  See sec. 1.163-9T(b)(3), Temporary Income Tax Regs., supra (cross-referencing sec. 1.163-8T, Temporary Income Tax Regs., supra, for rules determining the allocation of interest expense to various activities).

[18]  Treasury Decision 8145 refers to sec. 469(k)(4).  T.D. 8145, 1987-2 C.B. 47, 50.  That provision was redesignated as sec. 469(l)(4). See Appendix note 1.  For convenience, we refer to this provision as sec. 469(l)(4).

prescribe regulations relates to section 469 only.  Sec. 469(l)(4); <u>Hughes Intl. Sales Corp. v. Commissioner</u>, 100 T.C. 293, 303-304 (1993).

Section 1.163-9T, Temporary Income Tax Regs., <u>supra</u>, was promulgated under section 7805.  T.D. 8168, 1988-1 C.B. 80, 83. In the relevant Notice of Proposed Rulemaking, 1988-1 C.B. 926, 927, the Commissioner concluded that section 1.163-9T, Temporary Income Tax Regs., <u>supra</u>, is an interpretative regulation.  For purposes of the instant case, we agree with the Commissioner's conclusion and treat section 1.163-9T, Temporary Income Tax Regs., <u>supra</u>, as an interpretative regulation.

Although interpretative regulations are entitled to considerable weight, they are accorded less deference than legislative regulations, which are issued under a specific grant of authority to address a matter raised by the relevant statute. <u>Chevron U.S.A. v. Natural Res. Def. Council</u>, 467 U.S. 837, 843-844 (1984); <u>United States v. Vogel Fertilizer Co.</u>, 455 U.S. 16, 24 (1982).  Temporary regulations are accorded the same weight as final regulations.  <u>Peterson Marital Trust v. Commissioner</u>, 102 T.C. 790, 797 (1994), affd. 78 F.3d 795 (2d Cir. 1996).

An interpretative regulation is to be upheld if it "'implement[s] the congressional mandate in some reasonable manner.'" <u>United States v. Vogel Fertilizer Co.</u>, 455 U.S. at 24 (quoting <u>United States v. Correll</u>, 389 U.S. 299, 307 (1967)).  In

making this determination, we employ the following analysis set

forth by the Supreme Court:

> Under the formulation now familiar, when we confront an
> expert administrator's statutory exposition, we inquire
> first whether "the intent of Congress is clear" as to
> "the precise question at issue."  Chevron U.S.A. Inc.
> v. Natural Resources Defense Council, Inc., 467 U.S.
> 837, 842 (1984).  If so, "that is the end of the
> matter."  Ibid.  But "if the statute is silent or
> ambiguous with respect to the specific issue, the
> question for the court is whether the agency's answer
> is based on a permissible construction of the statute."
> Id., at 843.  If the administrator's reading fills a
> gap or defines a term in a way that is reasonable in
> light of the legislature's revealed design, we give the
> administrator's judgment "controlling weight."  Id., at
> 844.  [NationsBank of N.C., N.A. v. Variable Annuity
> Life Ins. Co., 513 U.S. 251, 257 (1995).]

Accordingly, we must first consider the statute and determine

whether section 163(h)(2)(A) is silent or ambiguous with respect

to the issue before us.  If we conclude that it is, then we must

consider the Secretary's regulatory interpretation of section

163(h)(2)(A) on this issue and determine whether that

interpretation represents a permissible construction of the

statute.  We address each of these considerations in turn.

(2) Silence or Ambiguity

As set forth supra, the relevant inquiry in the instant case

is whether petitioners' interest on their 1987 income tax

underpayment is "properly allocable to a trade or business".

We have concluded (supra F (5) Conclusions From the Statute

and the History of the Legislation) that the statutory text does

not on its face provide the answer to the question before us.  By

choosing to use a definition different from the statutory phrases we had earlier construed, the Congress apparently intended a meaning different from the meaning of those earlier statutory phrases, but the statutory text does not reveal specifically what that difference is. The history of the legislation provides some support for a specific answer, but that support is rebuttable.

Every Court of Appeals which has addressed the issue presented herein has reached the same conclusion that the statute is silent or ambiguous. Kikalos v. Commissioner, 190 F.3d at 797; McDonnell v. United States, 180 F.3d at 723; Allen v. United States, 173 F.3d at 536 (describing the term "properly allocable" as "manifestly ambiguous"); Redlark v. Commissioner, 141 F.3d at 940 (describing as "untenable" the "assertion that the words, 'properly allocable', unambiguously specify that interest on business-related personal income tax deficiencies should be deductible"); Miller v. United States, 65 F.3d at 690 (describing Congress's failure to "define what constitutes business interest" as "an implicit legislative delegation of authority to the Commissioner to clarify whether income tax deficiency interest is 'properly allocable to a trade or business.'"); see also Tedori v. United States, 211 F.3d 488, 493 (9th Cir. 2000) (stating "'the common and ordinary meaning' of the statutory phrase 'properly allocable to a trade or business' is not at all plain").

We conclude that section 163(h)(2)(A) is silent or ambiguous. We now proceed to the second prong of our analysis; i.e., whether the regulations in issue are based on permissible constructions of section 163(h)(2)(A).

(3) Permissible Construction

To be valid, a regulation need not be the only, or even the best, construction of the statute it purports to implement. Atlantic Mut. Ins. Co. v. Commissioner, 523 U.S. 382, 389 (1998); see Romann v. Commissioner, 111 T.C. 273, 282 (1998). The Supreme Court has stated that a reviewing court--

> need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding. [Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. at 843 n.11.]

Rather, the reviewing court need only conclude that the regulation is reasonable. Cottage Savings Assn. v. Commissioner, 499 U.S. 554, 560-561 (1991)(citing National Muffler Dealers Assn. v. United States, 440 U.S. 472, 476-477 (1979)). A regulation is reasonable if it harmonizes with the plain language, origin, and purpose of the statute it purports to implement. United States v. Vogel Fertilizer Co., 455 U.S. at 25-26; National Muffler Dealers Assn. v. United States, 440 U.S. at 477.

        (a) Section 1.163-8T, Temporary Income Tax Regs., 52 Fed. Reg. 24999 (July 2, 1987).

Section 1.163-8T, Temporary Income Tax Regs., supra, provides the rules for the allocation of interest expense for

purposes of sections 163(d), 163(h), and 469.  Sec. 1.163-8T(a)(1), Temporary Income Tax Regs., supra.  Although the Congress did not itself devise the allocation rules, the Congress clearly stated how it expected the allocation rules to operate. The Joint Statement of Managers portion of the conference committee report dealing with section 469 states, in pertinent part, as follows (H. Conf. Rept. 99-841 at II-146 (1986), 1986-3 C.B. (Vol. 4) at 146):

Expenses allocable to portfolio income.--The conference agreement provides that portfolio income is reduced by the deductible expenses (other than interest) that are clearly and directly allocable to such income.  Properly allocable interest expense also reduces portfolio income.  Such deductions accordingly are not treated as attributable to a passive activity.

The conferees anticipate that the Treasury will issue regulations setting forth standards for appropriate allocation of expenses and interest under the passive loss rule.  The conferees anticipate that regulations providing guidance to taxpayers with respect to interest allocation will be issued by December 31, 1986.  These regulations should be consistent with the purpose of the passive loss rules to prevent sheltering of income from personal services and portfolio income with passive losses.  Moreover, the regulations should attempt to avoid inconsistent allocation of interest deductions under different Code provisions.[4]

In the case of entities, a proper method of allocation may include, for example, allocation of interest to portfolio income on the basis of assets, although there may be situations in which tracing is appropriate because of the integrated nature of the transactions involved.  Because of the difficulty of recordkeeping that would be required were interest expense of individuals allocated rather than traced, it is anticipated that, in the case of individuals, interest expense generally will be traced to the asset or activity which is purchased or carried by incurring or continuing the underlying indebtedness.

_____

[4] For example, an interest deduction that is disallowed under section 265 or 291 should not be allowed, capitalized, or suspended under another provision.

The Congress's suggestion, however, specifically related to the allocation rules for section 469 only; the Joint Statement of Managers portion of the conference committee report does not provide a similar prescription for allocating interest expense for purposes of subsections (d) and (h) of section 163.  In TAMRA 1988, the Congress amended subsections (d) and (h) of section 163 to conform the relevant language thereof to the relevant language of section 469 in order to achieve "consistent application of a standard for allocation of interest" among the "related provisions" of sections 163(d), 163(h), and 469.  By conforming the language of subsections (d) and (h) to section 163 to the relevant language of section 469, the Congress gave a clear indication that the tracing regime it contemplated for purposes of section 469 is the allocation method that it also intended for subsections (d) and (h) of section 163.  See Appendix pp. 73-74.

An examination of section 1.163-8T, Temporary Income Tax Regs., supra, shows that the Secretary heeded the Congress's suggestion.  Section 1.163-8T, Temporary Income Tax Regs., supra, imposes the very tracing regime that the Congress contemplated. Sec. 1.163-8T(a)(3), Temporary Income Tax Regs., supra.

In sum, the Congress suggested the means by which to allocate interest expense for purposes of section 469; the

Secretary followed that suggestion; and the Congress later amended the relevant language of sections 163(d) and 163(h) to conform to the relevant language of section 469. In light of these circumstances, we conclude that the tracing regime that section 1.163-8T, Temporary Income Tax Regs., supra, imposes is a permissible construction of section 163(h)(2)(A).

In addition to providing rules for the allocation of interest expense, section 1.163-8T, Temporary Income Tax Regs., supra, also provides rules for the treatment of interest expense so allocated. Section 1.163-8T(a)(4)(A), Temporary Income Tax Regs., supra, provides that "Interest expense allocated to a trade or business expenditure (as defined in paragraph (b)(7) of this section) is taken into account under section 163(h)(2)(A)". Section 163(h)(2)(A) is the provision that petitioners contend applies to their payment of interest on their 1987 Federal individual income tax deficiency. Section 1.163-8T(b)(7), Temporary Income Tax Regs., supra, defines the term "trade or business expenditure" to mean "an expenditure (other than a passive activity expenditure or an investment expenditure) in connection with the conduct of any trade or business other than the trade or business of performing services as an employee." If an expenditure "is not a trade or business expenditure, a passive activity expenditure, or an investment expenditure", then section 1.163-8T(a)(4)(D), Temporary Income Tax Regs., supra, treats the

expenditure as personal interest for purposes of section 163(h). Sec. 1.163-8T(b)(5), Temporary Income Tax Regs., supra.

As previously noted, section 1.163-8T(c)(3)(ii), Temporary Income Tax Regs., 52 Fed. Reg. 25001 (July 2, 1987), allocates petitioners' payment of interest on their 1987 Federal individual income tax underpayment to the satisfaction thereof.  The treatment of petitioners' interest payment thus depends on whether the payment of one's Federal individual income tax liability is an expenditure that is "in connection with the conduct of any trade or business".  While reasonable arguments may lie on either side of this issue, the Secretary has undertaken to resolve it in promulgating section 1.163-9T(b)(2), Temporary Income Tax Regs., 52 Fed. Reg. 48409 (Dec. 22, 1987), and it is our charge not to resolve that issue ourselves, but rather to determine "whether there is any reasonable basis for the resolution embodied in the Commissioner's Regulation." Fulman v. United States, 434 U.S. 528, 536 (1978); see also CSX Corp. v. Commissioner, 89 T.C. 134, 153 (1987).  We now turn our attention to that task.

> (b)  Section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., 52 Fed. Reg. 48409 (Dec. 22, 1987)

As applied to the instant case, section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., supra, treats petitioners' payment of interest on their 1987 income tax underpayment as nondeductible "personal interest".  The text of

section 163(h)(2)(A) does not compel this result.  The relevant legislative history, however, lends some support to this interpretation of the statute.

The Joint Committee staff summary, which we did not consider in Redlark v. Commissioner, supra, provides, in pertinent part, as follows: "Interest on underpayments of tax (other than certain deferred estate taxes) is treated as personal interest under the provision [sec. 163(h)]."  Joint Committee staff summary at 18.  Under this view, interest on underpayments of "certain deferred estate taxes" is the only type of interest on underpayments of tax that is excluded from the definition of personal interest.  This view supports section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., supra, which includes interest paid on underpayments of Federal income taxes within the definition of personal interest.

We acknowledge that the Joint Committee staff summary is not the official legislative document for the conference committee's decisions about TRA 1986; that distinction is accorded the conference committee report.  Joint Committee staff summary at XIII.  Further, by definition, the Joint Committee staff summary may not be a complete or thorough statement of the conference decisions; summaries are designed to cover concisely the main points of the summarized topic, and they may lack specific detail.  However, the Joint Committee staff summary was provided

to the Members of the House and Senate for their reference before Congress enacted TRA 1986, and consequently it is part of the history of the legislation.  See, e.g., Newborn v. Commissioner, 94 T.C. 610, 620, 623 (1990).  Thus, before the enactment of TRA 1986, the Members of Congress had before them an interpretation of section 163(h) that included within the definition of "personal interest" interest on underpayments of income tax.

Although not as clearly expressed as in the Joint Committee staff summary, the relevant portions of the Joint Statement of Managers portion of the conference committee report may be read to echo the views expressed in the Joint Committee staff summary. The relevant portions of the Joint Statement of Managers portion of the conference committee report provide that "Personal interest also generally includes interest on tax deficiencies" and that "personal interest does not include * * * interest payable on estate tax deferred under sec. 6163 or 6166."  H. Conf. Rept. 99-841, at II-154, supra, 1986-3 C.B. (Vol. 4) at 154.  These portions of the Joint Statement of Managers Portion of the conference committee report may be read to support a view that interest on all tax underpayments other than interest in respect of estate tax deferred under either section 6163 or 6166 is to be treated as personal interest.

Although the Joint Statement of Managers portion of the conference committee report does not speak as clearly to the

issue before us as the Joint Committee staff summary does, one may reasonably view these two pieces of legislative history as being consistent with one another. At the very least, in light of the Joint Committee staff summary, and the validation of section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., supra, by five Courts of Appeals, an interpretation of the Joint Statement of Managers portion of the conference committee report that includes income tax deficiencies within the definition of personal interest cannot be said to be clearly inconsistent with section 163(h)(2)(A). We so conclude.

We reached the opposite conclusion in Redlark v. Commissioner, 106 T.C. at 46, and we used that conclusion as the basis for disregarding the 1986 Blue Book. The 1986 Blue Book provides, in pertinent part, as follows:

> Personal interest also includes interest on underpayments of individual Federal, State or local income taxes notwithstanding that all or a portion of the income may have arisen in a trade or business, because such taxes are not considered derived from the conduct of a trade or business.[60] However, personal interest does not include interest payable on estate tax deferred under sections 6163 or 6166.

---

[60] Personal interest does not include interest on taxes, other than income taxes, that are incurred in connection with a trade or business. (For the rule that taxes on net income are not attributable to a trade or business, see Treas. Reg. sec. 1.62-1(d), relating to nondeductibility of State income taxes in computing adjusted gross income.) * * * [1986 Blue Book at 266.]

The above quoted portion of the 1986 Blue Book clearly supports section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., supra.

In Redlark v. Commissioner, supra, we did not assign any weight to the 1986 Blue Book because we concluded that it conflicted with the Joint Statement of Managers and with what we there believed to be relevant prior caselaw. As we have explained, supra, that caselaw construed statutory language different from what we deal with herein. Also, the 1986 Blue Book is consistent with the Joint Committee staff summary, and we believe that the Joint Committee staff summary is consistent with the Joint Statement of Managers.

Whether one views the legislative history of section 163(h) as inconclusive or as consistent with section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., supra, the 1986 Blue Book warrants consideration. See FPC v. Memphis Light, Gas & Water Div., 411 U.S. 458, 471-472 (1973); Bank of Clearwater v. United States, 7 Cl. Ct. 289, 294 (1985). Consideration of the 1986 Blue Book (where, as here, it does not conflict with the enacted statutory language and does not conflict with what we have referred to as the conference committee sentence (supra F.(4) Thirdly)), in combination with the Joint Committee staff summary and the relevant portion of the Joint Statement of Managers portion of the conference committee report points toward a conclusion that section 1.163-9T(b)(2)(i)(A), Temporary Income

Tax Regs., supra, is a permissible construction of section 163(h)(2)(A).  We so conclude.

We have concluded that section 163(h)(2)(A) is silent or ambiguous.  We have also concluded that section 1.163-8T, Temporary Income Tax Regs., supra, and section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., supra, are permissible constructions of section 163(h)(2)(A).  Accordingly, we also conclude that both regulations are not invalid.  To the extent that Redlark v. Commissioner, supra, is inconsistent herewith, we no longer follow that opinion.

H.  Petitioners' Alternative Contention

Alternatively, petitioners contend that section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., supra, does not control because it relates to section 163(h)(2)(A) as enacted by TRA 1986, not to section 163(h)(2)(A) as amended by TAMRA 1988; section 163(h)(2)(A) as amended by TAMRA 1988 is the provision which applies in the instant case.  Respondent contends that section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., supra, controls because the amendment to section 163(h)(2)(A) was not intended to make any substantive change to the statute.  We agree with respondent.

As we stated in Redlark v. Commissioner, 106 T.C. at 34 n.3:

> The amended language, effective for the years in issue, was intended to conform the definition of personal interest to the language of the related passive loss and investment interest limitation

provisions, to permit consistent application of a standard for allocation of interest.  See S. Rept. 100-445, at 36 (1988); H. Rept. 100-795, at 35 (1988). There is no indication that the change in language was intended to make any substantive change in the meaning of the statutory language.

We hold for respondent on this issue.

<u>Decision will be entered</u>

<u>for respondent.</u>

Reviewed by the Court.

COHEN, WHALEN, HALPERN, BEGHE, and MARVEL, <u>JJ.</u>, agree with the majority opinion.

GERBER, CHIECHI, and GALE, <u>JJ.</u>, concur.

FOLEY, <u>J.</u>, did not participate in consideration of this case.

Appendix

History of the Legislation

(1)  The Treasury Report

In November 1984, the Treasury Department issued a report to the President entitled "Tax Reform for Fairness, Simplicity, and Economic Growth", hereinafter sometimes referred to as the Treasury Report.  In the Treasury Report, the Treasury Department explained that under then-governing law, all interest expense was "deductible, either as a business or investment expense or as an itemized deduction."  The Treasury Report at 83.  To

> curtail the subsidy implicit in the [then] current law deduction for interest on debt to finance large amounts of passive, tax-preferred, investment assets (such as corporate stock) or extraordinary consumption expenditures (such as second homes).

the Treasury Department proposed to limit the deductions individuals could claim for interest expense "to the sum of mortgage interest on the principal residence of the taxpayer, passive investment income (including interest income), and $5,000 per return."  Id.

(2)  The President's Proposals

In May 1985, President Reagan issued a report entitled "The President's Tax Proposals to the Congress for Fairness, Growth, and Simplicity", hereinafter sometimes referred to as the President's Proposals.  Chapter 13.01 of the President's Proposals addressed interest deductions and proposed to subject,

inter alia, "all interest not incurred in connection with a trade or business" to the then governing limitation on the deduction of investment interest under section 163(d). The President's Proposals at 323. Underlying this proposal was a concern that "consumer interest", defined as "i.e., interest incurred to acquire personal assets, such as a car or vacation home", undermined the then existing "limitations on investment interest and interest incurred to acquire tax-exempt bonds." Id. at 322-323.

(3) The House Bill

Subsection (d) of section 163 in then-current law was entitled "Limitation on Interest on Investment Indebtedness." In section 402(a) of H.R. 3838, the Ways and Means Committee proposed to deal with several concerns by revising subsection (d), which would be reentitled "Limitation on Nonbusiness Interest." The bill combined the different concerns into a single overall test, as appears from proposed new paragraphs (1) and (3) of subsection (d), as follows:

SEC. 402. LIMITATION ON DEDUCTION FOR NONBUSINESS INTEREST.

(a) General Rule.--Subsection (d) of section 163 (relating to limitation on interest on investment indebtedness) is amended to read as follows:

"(d) Limitation on Nonbusiness Interest.--

"(1) In general.--In the case of a taxpayer other than a corporation, the amount allowed as a deduction under this chapter for nonbusiness interest for any taxable year shall not exceed the sum of--

"(A) $10,000 ($20,000, in the case of a joint return), plus

"(B) the net investment income for the taxable year.

"In the case of a trust, the amount specified in subparagraph (A) shall be zero.

*　　*　　*　　*　　*　　*　　*

"(3) Nonbusiness interest.--For purposes of this subsection, the term 'nonbusiness interest' means any interest allowable as a deduction under this chapter (determined without regard to paragraph (1)); except that such term shall not include--

"(A) any qualified residence interest, and

"(B) any interest which is allowable as a deduction in computing adjusted gross income and which is not attributable to a limited business interest.

For purposes of the preceding sentence, the term 'interest' includes any amount allowable as a deduction in connection with personal property used in a short sale.["]

The term "limited business interest" is defined (in subsec. (d)(6)) in terms of lack of active participation in the business; it apparently would not apply to Edward's law practice.  As to the prior law's deductibility of interest in computing adjusted gross income, see infra F. (3) Pre-TRA 1986 Cases.

The Ways and Means Committee Report to accompany H.R. 3838, H. Rept. 99-426 (1985), 1986-3 C.B. (Vol. 2) 1, states, in pertinent part, as follows:

B. Interest Deduction Limitations (Sec. 402 of the bill
and sec. 163(d) of the Code)

Present Law

In general

*     *     *     *     *     *     *

Under present law, no limitation is imposed under
section 163(d) on the deductibility of either interest
on indebtedness incurred to purchase or carry
consumption goods, (i.e., personal (consumer)
interest), or interest on indebtedness incurred in
connection with the taxpayer's trade or business. [H.
Rept. 99-426 at 296 supra, 1986-3 C.B. (Vol. 2) at
296.]

*     *     *     *     *     *     *

Explanation of Provision

In general

The bill expands the scope of the interest
limitation, and alters the calculation of the amount of
the limitation.  Under the bill, all nonbusiness
interest is subject to the limitation on deductibility,
including consumer interest and certain interest that
is not treated as investment interest subject to
limitation under present law.  Nonbusiness interest
subject to the limitation under the bill does not
include interest on debt secured by the taxpayer's
principal residence (to the extent of its fair market
value), and interest on debt secured by a second
residence of the taxpayer (to the extent of its fair
market value).  Interest expense that is paid or
incurred in carrying on a trade or business (except for
interest attributable to certain limited business
interests not involving low-income housing), is not
subject to the interest deduction limitation under the
bill. [Id. at 298.]

*     *     *     *     *     *     *

Interest subject to the limitation

Under the bill, interest subject to the limitation is all interest on debt not incurred in connection with the taxpayer's trade or business, other than debt secured by the taxpayer's residences (as described above). Thus, interest subject to limitation generally includes investment interest subject to the section 163(d) limitation under present law and consumer interest, such as interest paid or incurred to purchase an automobile for personal use. * * * [Id. at 299-300.]

The House of Representatives passed H.R. 3838 without amendment to section 402 of H.R. 3838 as reported by the Ways and Means Committee.

(4) The Senate's Amendment

H.R. 3838 was received in the Senate on December 18, 1985, and referred to the Finance Committee. Section 1421 of H.R. 3838 as reported by the Finance Committee separated the above-noted considerations--investment interest and "consumer" interest. Section 1421(b) of the Finance Committee's amendment revised section 163(d) but, unlike the House-passed bill, left that Code provision as one dealing with investment interest. Section 1421(a) of the Finance Committee's amendment proposed a new section 163(h), which provided in pertinent part as follows:

SEC. 1421. LIMITATIONS ON DEDUCTION FOR NONBUSINESS INTEREST.

(a) Disallowance of Deduction for Consumer Interest of Individuals.--Section 163 (relating to deduction for interest) is amended by redesignating subsection (h) as subsection (i) and by inserting after subsection (g) the following new subsection:

"(h) Disallowance of Deduction for Consumer Interest.--

"(1) In general.--In the case of a taxpayer other than a corporation, no deduction shall be allowed under this chapter for consumer interest paid or accrued during the taxable year.

"(2) Consumer interest.--For purposes of this subsection--

"(A) In general.--The term 'consumer interest' means any interest allowable as a deduction under this chapter other than interest paid or accrued on indebtedness incurred or continued in connection with--

"(i) the conduct of a trade or business (other than the trade or business of performing services as an employee), or

"(ii) an activity described in section 212.

"(B) Exception for qualified residence interest.--The term 'consumer interest' shall not include any qualified residence interest.["]

The Senate Finance Committee report, provides, in pertinent part, as follows (S. Rept. 99-313, at 802-806 (1986), 1986-3 C.B. (Vol. 3) 1, 802-806):

G. Interest Deduction Limitations (sec. 1421 of the bill and secs. 163(d) and (h) of the Code)

Present Law

*     *     *     *     *     *     *

Other interest

Under present law, no limitation is imposed under section 163(d) on the deductibility of interest on indebtedness incurred for other purposes, e.g. to purchase or carry consumption goods.  Interest on indebtedness incurred in connection with the taxpayer's

trade or business is also not subject to the section 163(d) limitation under present law.

### Reasons for Change

*     *     *     *     *     *     *

Nonbusiness (consumer) interest

*     *     *     *     *     *     *

Although the committee believes it would not be advisable to subject to income tax imputed rental income with respect to consumer durables owned by the taxpayer, it does believe that it is appropriate and practical to address situations where consumer expenditures are financed by borrowing. By phasing out the present deductibility of consumer interest, the committee believes that it has eliminated from the present tax law a significant disincentive to saving.

*     *     *     *     *     *     *

### Explanation of Provisions

In general

The bill expands the scope of the interest limitation, and alters the calculation of the amount of the limitation. Under the bill, all nonbusiness interest is subject to the limitation on deductibility, including consumer interest and certain interest that is not treated as investment interest subject to limitation under present law. Interest subject to the limitation under the bill does not include interest on debt secured by the taxpayer's principal residence (to the extent of its fair market value), and interest on debt secured by a second residence of the taxpayer (to the extent of its fair market value). Interest expense that is paid or incurred in carrying on a trade or business is not subject to the interest deduction limitation under the bill (except for interest attributable to certain limited business interests).

In general, under the bill, consumer interest is not deductible, and the deduction for investment interest is limited to investment income for the year

with an indefinite carryforward of disallowed investment interest.

Investment interest limitation

<u>Interest subject to the limitation</u>.--Under the bill, interest subject to the investment interest limitation is all interest (other than consumer interest and qualified residence interest) on debt not incurred in connection with the taxpayer's trade or business. * * *

* * * * * * *

Consumer interest limitation

Under the bill, consumer interest is not deductible. Consumer interest generally includes all interest not incurred or continued in connection with the conduct of a trade or business (other than the performance of services as an employee) * * *. Thus, consumer interest includes, for example, interest on a loan to purchase an automobile for personal use, and credit card interest incurred for personal expenses.

In all material respects, section 1421 of H.R. 3838 as passed by the Senate on June 24, 1986, was identical to section 1421 of H.R. 3838 as reported by the Senate Finance Committee.

Section 1401 of the Senate amendment as reported by the Finance Committee proposed to add a new section, section 469, relating to limitations on losses and credits from passive activities. Neither the House bill, nor the President's Proposals contained a corresponding provision. H. Conf. Rept. 99-841, II-137 (1986), 1986-3 C.B. (Vol. 4) 137; Joint Committee on Taxation, Comparison of Tax Reform Provisions of H.R. 3838 as passed by the House and Senate (JCS-15-86), 51 (July 15, 1986). (Section 501 of the House-passed version of the bill did,

however, propose to deny excess passive activity losses for purposes of computing the amount of the alternative minimum taxable income.  See TRA 1986 sec. 701, 100 Stat. 2320, 2336; H. Rept. 99-426, at 320-323; supra, 1986-3 C.B. (Vol. 2) 320-323.)

Section 1401 of the Senate amendment to H.R. 3838 as reported by the Finance Committee provides, in pertinent part, as follows:

SEC. 469. LIMITATIONS ON LOSSES AND CREDITS FROM PASSIVE ACTIVITIES.

*    *    *    *    *    *    *

(h) Regulations.--The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out provisions of this section, including regulations--

(1) which specify what constitutes an activity or material participation for purposes of this section,

(2) which provide that certain items of gross income will not be taken into account in determining income or loss from any activity (and the treatment of expenses allocable to such income), and

(3) if necessary to prevent avoidance of this section, determining whether income, gain, or loss from a limited partnership or other passive activity is treated as described in subsection (c)(3).

The Finance Committee report on H.R. 3838 did not explain how the regulations promulgated under section 469 were to allocate interest expense.  S. Rept. 99-313, at 713-746, supra, 1986-3 C.B. (Vol. 3) at 713-746.

Section 1401 of the Senate amendment to H.R. 3838 was amended by a floor amendment and passed; the amendment did not affect the above quoted language. 132 Cong. Rec. S 8817, S 8915-8916 (June 26, 2986); Joint Committee on Taxation, Comparison of Tax Reform Provisions of H.R. 3838 as passed by the House and Senate (JCS-15-86), 52 (July 15, 1986).

(5) <u>The Conference Committee</u>

On August 29, 1986, the staff of the Joint Committee on Taxation published a pamphlet (hereinafter sometimes referred to as the Joint Committee staff summary) described as follows (Joint Committee staff summary at xiii):

> This pamphlet[1] provides a title-by-title summary of the principal provisions of H.R. 3838 (Tax Reform Act of 1986), as agreed to by the House-Senate Conferees on August 16, 1986. As a general rule, this pamphlet does not describe agreements of the Conferees not to adopt a particular provision that was only in the House-passed bill or only in the Senate-passed bill, i.e., agreements to retain present law on particular issues.

> This pamphlet is provided for the use of the Members of the House and the Senate. The official legislative document on the conference decisions on H.R. 3838 will be the conference report on the bill (including the Statement of Managers explaining the conference decisions).

_____

[1] This pamphlet may be cited as follows: Joint Committee on Taxation, Summary of Conference Agreement on H.R. 3838 (Tax Reform Act of 19886)(JCS-16-86), August 29, 1986.

The Joint Committee staff summary describes the relevant portion of the conference agreement as follows:

C. Interest Deduction Limitation

No deduction is allowed for personal interest (such as interest on car loans or credit card balances for personal expenditures). Interest on underpayments of tax (other than certain deferred estate taxes) is treated as personal interest under the provision. * * * [Joint Committee Summary at 18.]

The conference committee report (H. Conf. Rept. 99-841, supra, 1986-3 C.B. (Vol. 4) 1) was published on September 18, 1986. Section 511 of the conference committee report corresponds to section 1421 of H.R. 3838 as passed by the Senate. In large part, section 511(b) of the conference committee report tracks section 1421(a) of H.R. 3838 as passed by the Senate. Section 511(b) of the conference committee report presents a new section 163(h), which provides in pertinent part as follows:

(h) Disallowance of Deduction for Personal Interest.--

(1) In general.--In the case of a taxpayer other than a corporation, no deduction shall be allowed under this chapter for personal interest paid or accrued during the taxable year.

(2) Personal interest.--For purposes of this subsection, the term "personal interest" means any interest allowable as a deduction under this chapter other than--

(A) interest paid or accrued on indebtedness incurred or continued in connection with the conduct of a trade or business (other than the trade or business of performing services as an employee),

(B) any investment interest (within the meaning of subsection (d)),

(C) any interest which is taken into account under section 469 in computing income or loss from a passive activity of the taxpayer,

(D) any qualified residence interest (within the meaning of paragraph (3)), and

(E) any interest payable under section 6601 on any unpaid portion of the tax imposed by section 2001 for the period during which an extension of time for payment of such tax is in effect under section 6163 or 6166.  [H. Conf. Rept. 99-841, at I-171 (1986).]

The Joint Statement of Managers portion of the conference committee report provides, in pertinent part, as follows:

House Bill

Under the House bill, the deduction for nonbusiness interest of noncorporate taxpayers is limited to $10,000 ($20,000 for joint returns), plus net investment income, plus certain deductible expenditures in excess of rental income from net lease property. * * *

* * * * * * *

Nonbusiness interest means all interest not incurred in the taxpayer's trade or business, including the taxpayer's share of interest of S corporations in whose management he does not actively participate, the taxpayer's share of interest expense of limited partnerships in which he is a limited partner, and the taxpayer's share of interest expense of certain trusts and other entities in which he is a limited entrepreneur.

* * * * * * *

Senate Amendment

The Senate amendment provides that the deduction for investment interest of noncorporate taxpayers is limited to net investment income, plus certain deductible expenditures in excess of rental income from net lease property. Consumer interest is not deductible.  Interest on debt secured by the taxpayer's principal residence and a second

residence of the taxpayer (to the extent of their fair market values) is not subject to limitation.

* * * Consumer interest means interest not attributable to a trade or business (other than the trade or business of performing services as an employee) or to an activity engaged in for profit.

* * * * * * *

Conference Agreement

The conference agreement follows the Senate amendment, with modifications and clarifications.

* * * * * * *

Personal interest

The conference agreement follows the Senate amendment provision with respect to consumer interest (denominated personal interest under the conference agreement), with modifications and clarifications.

Under the conference agreement, personal interest is not deductible. Personal interest is any interest, other than interest incurred or continued in connection with the conduct of a trade or business (other than the trade or business of performing services as a employee), investment interest, or interest taken into account in computing the taxpayer's income or loss from passive activities for the year. Personal interest also generally includes interest on tax deficiencies.

Personal interest does not include qualified residence interest of the taxpayer, nor does it include interest payable on estate tax deferred under sec. 6163 or 6166. [H. Conf. Rept. 99-841, at II-151 to II-154, supra, 1986-3 C.B. (Vol. 4) at 151-154.]

In all material respects, section 511(b) as reported by the conference committee was identical to section 511(b) of H.R. 3838 as ultimately enacted, on October 22, 1986. TRA 1986 sec. 511(b), Pub. L. 99-514, 100 Stat. 2085, 2246-2248, 2963.

The conference agreement on H.R. 3838 generally follows section 1401 of the Senate amendment, relating to limitations on losses and credits from passive activities, but with certain modifications and clarifications.  H. Conf. Rept. 99-841, at II-138, supra, 1986-3 C.B. (Vol. 4) at 138.  As modified, clarified, and enacted, section 469 provides, in pertinent part, as follows:

SEC. 469. PASSIVE ACTIVITY LOSSES AND CREDITS LIMITED.

 *     *     *     *     *     *     *

(k) Regulations.--The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out provisions of this section, including regulations--

 *     *     *     *     *     *     *

(4) which provide for the determination of the allocation of interest expense for purposes of this section * * *.[1] [TRA 1986 sec. 501(a), Pub. L. 99-514, 100 Stat. 2085, 2233, 2240.]

The Joint Statement of Managers portion of the conference committee report explaining interest expense allocation under section 469 provides--

Expenses allocable to portfolio income.--The conference agreement provides that portfolio income is reduced by the deductible expenses (other than interest) that are clearly and directly allocable to such income.  Properly allocable interest expense also reduces portfolio income.  Such deductions accordingly are not treated as attributable to a passive activity.

The conferees anticipate that the Treasury will issue regulations setting forth standards for

---

[1] Sec. 10212(a) of the Omnibus Budget Reconciliation Act of 1987, Pub. L. 100-203, 101 Stat. 1330, 1330-405, redesignated sec. 469(k)(4) as sec. 469(l)(4).

appropriate allocation of expenses and interest under the passive loss rule.  The conferees anticipate that regulations providing guidance to taxpayers with respect to interest allocation will be issued by December 31, 1986.  These regulations should be consistent with the purpose of the passive loss rules to prevent sheltering of income from personal services and portfolio income with passive losses.  Moreover, the regulations should attempt to avoid inconsistent allocation of interest deductions under different Code provisions.[4]

In the case of entities, a proper method of allocation may include, for example, allocation of interest to portfolio income on the basis of assets, although there may be situations in which tracing is appropriate because of the integrated nature of the transactions involved.  Because of the difficulty of recordkeeping that would be required were interest expense of individuals allocated rather than traced, it is anticipated that, in the case of individuals, interest expense generally will be traced to the asset or activity which is purchased or carried by incurring or continuing the underlying indebtedness.

_____

[4]  For example, an interest deduction that is disallowed under section 265 [relating to expenses and interest relating to tax-exempt income] or 291 [relating to special rules relating to corporate preference items] should not be allowed, capitalized, or suspended under another provision.  [H. Conf. Rept. 99-841, at II-146, supra, 1986-3 C.B. (Vol. 4), at 146.]

(6) 1986 Blue Book

On May 4, 1987, the staff of the Joint Committee on Taxation published its General Explanation of the Tax Reform Act of 1986 (1986 Blue Book), which states in pertinent part as follows (pp. 262-264, 266):

C.  Interest Deduction Limitations (Sec. 511 of the Act and secs. 163(d) and (h) of the Code)[55]

Prior Law

*   *   *   *   *   *   *

Other interest

Under prior law, no limitation was imposed under
section 163(d) on the deductibility of interest on
indebtedness incurred for other purposes, e.g. to purchase
or carry consumption goods.  Under prior and present law,
interest on indebtedness incurred in connection with the
taxpayer's trade or business is also not subject to the
limitation on the deductibility of interest expense under
section 163.

Reasons for Change

*   *   *   *   *   *   *

Personal interest

Prior law excluded or mismeasured income arising from
the ownership of housing and other consumer durables.
Investment in such goods allowed consumers to avoid the tax
that would apply if funds were invested in assets producing
taxable income and to avoid the cost of renting these items,
a cost which would not be deductible in computing tax
liability.  Thus, the tax system under prior law provided an
incentive to invest in consumer durables rather than assets
which produce taxable income and, therefore, an incentive to
consume rather than save.

*   *   *   *   *   *   *

Explanation of Provisions

In general

In general, under the Act, personal interest is not
deductible, and the deduction for investment interest is
limited to investment income for the year with an indefinite
carryforward of disallowed investment interest.  The
personal interest limitation does not apply to interest on
debt secured by the taxpayer's principal residence (to the
extent of its basis plus the amount of such debt used to pay
certain educational or medical expenses) and interest on
debt secured by a second residence of the taxpayer (to the

extent of its basis plus the amount of such debt used to pay
certain educational or medical expenses), provided the total
amount of such debt does not exceed the fair market value of
such residence.

* * * * * * *

Personal interest

Under the Act, personal interest is not deductible.
Personal interest is any interest, other than interest
incurred or continued in connection with the conduct of a
trade or business (other than the trade or business of
performing services as an employee), * * * investment
interest, or interest taken into account of computing the
taxpayer's income or loss from passive activities for the
year. Thus, personal interest includes, for example,
interest on a loan to purchase an automobile, interest on a
loan to purchase a life insurance policy, and credit card
interest, where such interest is not incurred or continued
in connection with the conduct of a trade or business.
Personal interest also includes interest on underpayments of
individual Federal, State or local income taxes
notwithstanding that all or a portion of the income may have
arisen in a trade or business, because such taxes are not
considered derived from the conduct of a trade or
business.[60] However, personal interest does not include
interest payable on estate tax deferred under sections 6163
or 6166.

Personal interest does not include qualified residence
interest of the taxpayer, as discussed below.

_____

[55] For legislative background of the provision, see: H.R.
3838, as reported by the House Committee on Ways and Means
on December 7, 1985, sec. 402; H.Rep. 99-426, pp. 296-301;
H.R. 3838 as reported by the Senate Committee on Finance on
May 29, 1986, sec. 1421; S.Rep. 99-313, pp. 802-808; and
H.Rep. 99-841, Vol. II (September 18, 1986), pp. 151-157
(Conference Report).

[60] Personal interest does not include interest on taxes,
other than income taxes, that are incurred in connection
with a trade or business. (For the rule that taxes on net
income are not attributable to a trade or business, see
Treas. Reg. sec. 1.62-1(d), relating to nondeductibility of
State income taxes in computing adjusted gross income.) In

addition, personal interest does not include interest of an S corporation which is attributable to an underpayment of income tax from a year in which the corporation was a C corporation or from the underpayment of the taxes imposed by sec. 1374 or 1375.  Nor does personal interest include interest on an underpayment of income tax of a corporation payable by a shareholder by reason of transferee liability (under sec. 6901).

(7)  <u>TAMRA 1988</u>

On June 10, 1987, the Technical Corrections Act of 1987 was introduced in the House of Representatives (H.R. 2636) by Ways and Means Committee Chairman Rostenkowski and Congressman Duncan, and in the Senate (S. 1350) by Finance Committee Chairman Bentsen and Senator Packwood.  Section 105(c) of the bills provided as follows:

> SEC. 105.  AMENDMENTS RELATED TO TITLE V OF THE REFORM ACT.
>           [The Tax Reform Act of 1986, see sec. 1(b)(2)
>           of the bills.]
>
> *    *    *    *    *    *    *
>
>     (c) Amendments Related to Section 511 of the Reform
> Act.--
>
>         (1) Subparagraph (A) of section 163(d)(3) of the
>     1986 Code (defining investment interest) is amended by
>     striking out "incurred or continued to purchase or
>     carry" and inserting in lieu thereof "properly
>     allocable to".
>
> *    *    *    *    *    *    *
>
>         (4) Subparagraph (A) of section 163(h)(2) of the
>     1986 Code is amended by striking out "incurred or
>     continued in connection with the conduct of" and
>     inserting in lieu thereof "properly allocable to".

Section 119 of the bills provided that these amendments "shall take effect as if included in the provision of the Reform Act to which such amendment relates."

On June 15, 1987, the staff of the Joint Committee on Taxation released its Description of the Technical Corrections Act of 1987 (H.R. 2636 and S. 1350) (JCS-15-87), June 15, 1987. At pages 25 and 26, this staff pamphlet describes the above amendments as follows:

### Explanation of Provisions

Investment interest.--The bill conforms the language of the definition of investment interest to the language of a related provision that allocates interest expense to portfolio income under the passive loss rule. Thus, under the bill, investment interest is that which is properly allocable to property held for investment. This change results in consistency in the language of the provisions allocating interest expense to the category of investment interest, and permits consistent application of a standard for allocation of interest. This change is not intended to suggest the adoption of any particular method of allocation, but rather to give Treasury the ability to devise allocation rules as simple as possible consistent with the objectives of the provision.

\* \* \* \* \* \* \*

Personal interest.--The bill conforms the language of the definition of personal interest to the language of related provisions (the passive loss rule and the investment interest limitation) under which interest expense may be allocated. Thus, the bill provides that personal interest does not include interest that is properly allocable to a trade or business. This change results in consistency in the language of several significant provisions under which interest is likely to be allocated, and permits consistent application of a standard for allocation of interest.

As amended, the provisions of the House bill were included as Subtitle B of Title X (Revenue Provisions) of the Omnibus Budget Reconciliation Act of 1987 (H.R. 3545) as passed by the House in October 1987. H. Rept. 100-795, at 2. Paragraphs (1) and (4) of section 10205(c) of the House-passed H.R. 3545 are identical to the language of paragraphs (1) and (4) of section 105(c) of H.R. 2636 set forth supra. The description of the amendment to the definition of "personal interest" in the House Budget Committee's report (the committee report for H.R. 3545) is identical to the description of the amendment in the staff pamphlet describing section 105(c)(4) of H.R. 2636 as introduced, set forth supra. H. Rept. 100-391, at 1171 (1987). The report's description of the amendment to the definition of "investment interest" adds to the description in the staff pamphlet describing section 105(c)(1) of H.R. 2636 as introduced, set forth supra. Id. at 1170. Below is the committee report explanation of the amendment to the definition of "investment interest"; the underscored language signifies language that was not included in the staff pamphlet describing section 105(c)(1) of H.R. 2636 as introduced:

Explanation of Provisions

Investment interest.--The bill conforms the language of the definition of investment interest to the language of a related provision that allocates interest expense to portfolio income under the passive loss rule. Thus, under the bill, investment interest is that which is properly allocable to property held

for investment.  This change results in consistency in the language of the provisions allocating interest expense to the category of investment interest, and permits consistent application of a standard for allocation of interest.  This change is not intended to suggest that the adoption of any particular method of allocation is required, but rather to give Treasury the ability to devise allocation rules as simple as possible consistent with the objectives of the provision.  The committee believes that the Treasury should consider rules relating to the securing of property to mitigate some of the complexities of tracing where simplicity is desirable, so that, for example, any interest on a loan secured by personal use property could be considered personal interest, and any interest on a loan secured by investment assets could be considered investment interest. [H. Rept. 100-391, at 1170 (1987); emphasis added.]

On December 4, 1987, Senate Budget Committee Chairman Chiles reported S. 1920 to the Senate; part II of subtitle B of title IV of S. 1920 as reported relates to technical amendments to TRA 1986.  Paragraphs (1) and (4) of section 4665(c) of S. 1920 as reported are identical to the language of paragraphs (1) and (4) of section 105(c) of S. 1350 as introduced, set forth supra.  The paragraph of the document explaining the bill's (S. 1920) amendment to the definition of "investment interest" as reported, except for two typographical errors, is identical to the corresponding paragraph of the House report, set forth supra. Reconciliation Submissions of the Instructed Committees Pursuant to the Concurrent Resolution on the Budget for Fiscal Year 1988 (H. Con. Res. 93, Rept. 100-76), Senate Budget Committee, 100th Cong., 1st Sess. at 272.  The paragraph of the document explaining the bill's (S. 1920) amendment to the definition of

"personal interest" is identical to both the corresponding paragraph in the House report and the staff pamphlet describing the provision in S. 1350 as introduced, set forth supra. Reconciliation Submissions of the Instructed Committees Pursuant to the Concurrent Resolution on the Budget for Fiscal Year 1988 (H. Con. Res. 93, Rept. 100-76), Senate Budget Committee, 100th Cong., 1st Sess. at 272.

As a result of a budget summit with the White House, the technical corrections were taken out of the budget reconciliation bill for 1987. H. Rept. 100-495, at 1014 (1987), 1987-3 C.B. at 294; 133 Cong. Rec. 34899 (Dec. 10, 1987) (colloquy between Finance Committee Chairman Bentsen and Senator Cranston.) The Senate then considered S. 1920, and, after completing work on floor amendments, called up the House-passed bill (H.R. 3545), substituted the text of S. 1920 as amended, and asked for a conference. 133 Cong. Rec. 34935 (Dec. 10, 1987). The Senate-passed amendment to H.R. 3545 did not include the technical corrections in S. 1920 and they were not included in the bill as enacted. S. Rept. 100-445 at 3.

On March 31, 1988, the Technical Corrections Act of 1988 was introduced in the House of Representatives (H.R. 4333) by Ways and Means Committee Chairman Rostenkowski and Congressman Duncan, and in the Senate (S. 2238) by Finance Committee Chairman Bentsen and Senator Packwood. Paragraphs (1) and (4) of section 105(c)

of the bills were identical to paragraphs (1) and (4) of section 105(c) of  H.R. 2636 and S. 1350 as introduced on June 10, 1987, set forth <u>supra</u>.

Section 121 of the bills (H.R. 4333 and S. 2238) provided that these amendments "shall take effect as if included in the provision of the Reform Act to which such amendment relates."

On April 6, 1988, the staff of the Joint Committee on Taxation released its Description of the Technical Corrections Act of 1988 (H.R. 4333 and S. 2238) (JCS-10-88), March 31, 1988. At pages 34 and 35, the staff pamphlet descriptions of the above amendments are identical to the committee report explanations of the same amendments to the definitions of "investment interest" and "personal interest" as proposed in 1987, set forth <u>supra</u>.

On July 26, 1988, the Ways and Means Committee reported H.R. 4333 with an amendment that replaced the entire text of the introduced bill.  H. Rept. 100-795, at 1 (1988).  Paragraphs (1) and (4) of section 105(c) of the Committee's amendment are identical to the introduced bill's language and to paragraphs (1) and (4) of section 105(c) of H.R. 2636 and S. 1350 as introduced on June 10, 1987, set forth <u>supra</u>.  The Committee's report states, in pertinent part, as follows (H. Rept. 100-795, at 3 (1988)):

## II. EXPLANATION OF THE BILL

### TITLE I.--TECHNICAL CORRECTIONS TO THE TAX REFORM ACT OF 1986

The technical correction titles (Title I and Title II)[2] contain clerical, conforming and clarifying amendments to the provisions enacted by the Tax Reform Act of 1986 (P.L. 99-514) and other recently enacted legislation.  All amendments are [sic] made by these titles are meant to carry out the intent of Congress in enacting the original legislation.  Therefore, no separate "Reasons for Change" is set forth for each individual amendment.  Except as otherwise described, the amendments made by the technical correction titles will take effect as if included in the original legislation to which each amendment relates.

The report's descriptions of the amendments to the definitions of "investment interest" and "personal interest" are identical to the descriptions in the staff pamphlet describing the introduced bill which are identical to the 1987 committee report descriptions of the same amendments, set forth supra. H. Rept. 100-795, at 34, 35 (1988).

On August 3, 1988, the Finance Committee reported S. 2238 with an amendment that replaced the entire text of the introduced bill.  S. Rept. 100-445, at 1 (1988).  Paragraphs (1) and (4) of section 105(c) of the Committee's amendment are identical to the introduced bill's language and to paragraphs (1) and (4) of section 105(c) as introduced in 1987 in H.R. 2636 and S. 1350,

---

[2]  The Ways and Means Committee's amendment added titles III (Substantive Tax Provisions) and IV (Ways and Means Subcommittee Provisions), and changed the short title of the bill (sec. 1(a)) to Miscellaneous Revenue Act of 1988.

set forth supra. The first paragraph of the Committee report's explanation of the bill is identical to the corresponding paragraph of the Ways and Means Committee's report which is identical to the Committee report explanations of the same amendment as introduced on June 10, 1987 in H.R. 2636 and S. 1350, set forth supra.[3] S. Rept. 100-445, at 4 (1988).

The Finance Committee report's descriptions of the amendments to the definitions of "investment interest" and "personal interest" are identical to the descriptions in the staff pamphlet describing the introduced bill which are identical to the 1987 committee report explanations of the same amendments, set forth supra. Id. at 35, 36.

The Senate considered S. 2238 and, after completing work on floor amendments, called up the House-passed bill (H.R. 4333), substituted the text of S. 2238 as amended, passed H.R. 4333 as so amended, and asked for a conference. 134 Cong. Rec. 29792 (Oct. 11, 1988). The House and Senate amendments to the investment interest and personal interest definitions being identical, they were approved without further explanation by the conference committee. H. Conf. Rept. 100-1104, Vol. I at 53, 54,

---

[3] The Finance Committee's amendment added titles III (Corrections to Collection and Exemption Procedures for Excise Taxes on Diesel and Nongasoline Aviation Fuels), IV (Other Corrections and Modifications), V (Railroad Unemployment and Retirement Amendments), and VI (Social Security Act Amendments), but did not change the short title of the bill (sec. 1(a)).

Vol. II at 2 (1988), 1988-3 C.B. 473, 492; see Staff of Joint Committee on Taxation, Comparison of Differing Provisions of Technical Corrections (JCX-30-88), 2 (1988).

The above-described amendments were enacted by paragraphs (1) and (4) of section 1005(c) of the Technical and Miscellaneous Revenue Act of 1988 (TAMRA 1988), Pub. L. 100-647, 102 Stat. 3342, 3390; by section 1019(a) of that Act they took effect as if included in the respective TRA 1986 provisions.  TAMRA 1988 sec. 1019(a), 102 Stat. at 3593.

RUWE, <u>J</u>., concurring:  I agree with the result reached by the majority; however, I cannot agree with the majority's suggestion that the personal nature of the underlying income tax deficiency and the related interest plays no role in determining the validity of section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., 52 Fed. Reg. 48407 (Dec. 22, 1987).  On the contrary, as I made clear in my dissenting opinion in <u>Redlark v. Commissioner</u>, 106 T.C. 31, 58, 60 (1996), I believe this to be a relevant and important factor.  The Courts of Appeals that have addressed this issue seem to agree.  See <u>Kikalos v. Commissioner</u>, 190 F.3d 791, 797-798 (7th Cir. 1999), revg. T.C. Memo. 1998-92; <u>McDonnell v. United States</u>, 180 F.3d 721, 723 (6th Cir. 1999); <u>Allen v. United States</u>, 173 F.3d 533, 537 (4th Cir. 1999); <u>Redlark v. Commissioner</u>, 141 F.3d 936, 941 (9th Cir. 1998), revg. and remanding 106 T.C. 31 (1996); <u>Miller v. United States</u>, 65 F.3d 687, 690-691 (8th Cir. 1995).

THORNTON, J., concurring: I am concerned that the majority

opinion may contribute to confusion over the interpretive weight

this Court will accord nonauthoritative congressional staff

materials.

In its analysis, the majority opinion relies heavily on

certain language appearing in the Joint Committee on Taxation

General Explanation of the Tax Reform Act of 1986 (the Blue

Book). In Redlark v. Commissioner, 106 T.C. 31, 45-46 (1996),

revd. and remanded 141 F.3d 936 (9th Cir. 1998), this Court

pointedly disregarded this same Blue Book language, stating:

> Where there is no corroboration in the actual
> legislative history, we shall not hesitate to disregard
> the General Explanation [of the Blue Book] as far as
> congressional intent is concerned. * * * Given the
> clear thrust of the conference committee report, the
> General Explanation [of the Blue Book] is without
> foundation and must fall by the wayside. To conclude
> otherwise would elevate it to a status and accord it a
> deference to which it simply is not entitled.

Other opinions of this Court echo the notion that we require some

direct corroboration of congressional intentions before we defer

to Blue Book expressions thereof. See Allen v. Commissioner, 118

T.C. 1, 15 (2002) ("Although the Staff of the Joint Committee's

explanation of a tax statute may be entitled to respect as a

document that is prepared in connection with the legislative

process by individuals who are intimately involved in that

process, we shall not hesitate to disregard the expressions set

forth therein where, as here, those expressions are barren of

corroboration in the legislative history."); <u>Zinniel v.</u>
<u>Commissioner</u>, 89 T.C. 357, 367 (1987) ("the portion of the
General Explanation [of the Blue Book] * * *, standing alone,
without any direct evidence of legislative intent, is not
unequivocal evidence of legislative intent"), affd. 883 F.2d 1350
(7th Cir. 1989).

The majority opinion's reliance on the Blue Book in
overturning this Court's decision in <u>Redlark v. Commissioner</u>,
<u>supra</u>, raises at least three concerns:

First, to the extent the majority opinion purports to find
corroboration for the Blue Book language in a Joint Committee
staff summary "published" during the conference on the 1986 Act
(and not expressly considered in this Court's <u>Redlark</u> opinion),
it is unsatisfactory.  The Joint Committee staff summary is
scarcely more reliable an indicator of congressional intentions
than the Blue Book itself.  Like the Blue Book, the Joint
Committee summary was a staff-generated document; it was released
as a committee print rather than as a report; there is no
indication that any Member of Congress approved it during
consideration of the 1986 Act.  A mere proliferation (or more
precisely, a mere doubling up) of staff-generated materials
cannot supply the want of direct evidence of congressional
intentions.

Second, to the extent the majority opinion means to repudiate the views of this Court as expressed in Redlark and other opinions, requiring some direct corroboration of Blue Book expressions of congressional intentions, it raises significant questions about the standard this Court now intends to apply in assessing the interpretive weight to accord materials like the Blue Book that technically are not part of the legislative history. The only express clue provided by the majority opinion appears in its statement that "if a Blue Book were to conflict with enacted language or controlling legislative history, then the statutory language or the controlling legislative history would prevail." Majority op. p. 35. This statement might be construed as suggesting that, even in the absence of direct corroboration in the statute or other controlling legislative materials, a Blue Book explanation will be considered as controlling unless it actually conflicts with these materials. Any such suggestion is troublesome. As has been observed elsewhere, there should be no "one generic standard for assessing the Blue Book's authority"; rather, the "Blue Book's interpretative weight depends, in large measure, on the role it is performing." Livingston, "What's Blue and White and Not Quite as Good as a Committee Report: General Explanations and the Role of 'Subsequent' Tax Legislative History", 11 Am. J. Tax Poly. 91, 105, 122 (1994). Where, as here, a Blue Book explanation does

more than merely collate materials from the official committee reports or clarify inconsistencies therein, and instead purports to add a new gloss to the statute, we should be free to disregard the Blue Book explanation or at least accord it greatly reduced interpretive weight.

Third, the stark divergence between this Court's analysis in Redlark, where we felt compelled to disregard the Blue Book language altogether, and in the majority opinion, which appears to treat it as a substantial component of its analysis, might be thought to largely account for the different results then and now.  As demonstrated, however, by the decisions of the five courts of appeal to address this issue, which have coalesced around a straightforward analysis of judicial deference to agency actions, the Blue Book language (with or without the Joint Committee summary) is not dispositive of the validity of the Treasury regulations (which is, after all, the issue before us). Rather, the Treasury regulations are ultimately validated as reasonably interpreting a facially ambiguous statute.  The Blue Book language in question, while supportive of this result, is not essential to it.  By unduly elevating the Blue Book's role in our analysis, we risk giving encouragement to inventive counsel in future cases to troll deeply for other types of noncontrolling legislative materials that might be argued to betoken congressional intent.

GERBER and GALE, JJ., agree with this concurring opinion.

WELLS, C.J., dissenting:  I respectfully dissent from the majority's refusal to follow Redlark v. Commissioner, 106 T.C. 31 (1996), revd. and remanded 141 F.3d 936 (9th Cir. 1998).  The meaning of section 163(h)(2)(A) can be discerned from a plain reading of the language of that section.  Moreover, prior caselaw defined the required nexus between an interest expense on a deficiency and a trade or business, and Congress did not indicate any intent to overturn these cases.  Also, the majority placed undue emphasis and reliance on the Blue Book in validating section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., 52 Fed. Reg. 48407 (Dec. 22, 1987) in contravention of precedent.

The majority contends that the language of section 163(h)(2)(A) is ambiguous, but the majority provides little analysis of the statute itself.  Section 163(h)(2)(A) provides as follows:

Sec. 163(h) Disallowance of Deduction for Personal Interest. --

(1) In general.--In the case of a taxpayer other than a corporation, no deduction shall be allowed under this chapter for personal interest paid or accrued during the taxable year.

(2) Personal interest.--For purposes of this section, the term "personal interest" means any interest allowable as a deduction under this chapter other than–

(A) interest paid or accrued on indebtedness properly allocable to a trade or business (other than the trade or business of performing services as an employee).

Petitioners contend that they should be permitted to deduct interest paid on a deficiency arising from disallowed Schedule C deductions relating to a sole proprietorship, a law firm.

Although section 163(h)(1) disallows personal interest deductions, the reach of that section is truncated by section 163(h)(2)(A), which excepts interest "properly allocable" to a trade or business from the definition of personal interest. Congress did not provide a definition for interest "properly allocable" to a trade or business. In interpreting what Congress meant by "properly allocable" to a trade or business, however, courts should give the phrase "properly allocable" its usual or plain meaning. United States v. Urrabazo, 234 F.3d 904 (5th Cir. 2000). A reasonable reading of the phrase "properly allocable" would conclude that the phrase means fairly or correctly relating to a trade or business. Interest paid on deficiencies arising from deductions taken by a sole proprietorship should fall within this class of interest. Courts should only depart from the plain language of a statute to, "avoid a result so bizarre that Congress could not have intended it". Withrow v. Roell, 288 F.3d 199, 203 (5th Cir. 2002). Reaching the conclusion that the interest paid on a deficiency arising from a sole proprietorship is "properly allocable" to a trade or business is surely not a bizarre result.

The intent of Congress is best determined by examining the language of the statute. Dial One of the Mid-South, Inc. v.

BellSouth Telecomms., Inc., 269 F.3d 523 (5th Cir. 2001). Congress defined the types of interest excepted from "personal interest" by direct references to other code sections, except for interest "properly allocable" to trade or business income. From this it can be inferred that the intent of Congress was to use the plain meaning of the term "properly allocable" to trade or business interest. In section 163(h)(2)(B), Congress refers to section 163(d) for a definition of investment interest. In section 163(h)(2)(C), Congress refers to section 469 for the definition of portfolio interest. In section 163(h)(2)(D), Congress refers to section 163(h)(3) for a definition of qualified residence interest. In section 163(h)(2)(E), Congress refers to section 6601. Finally, in section 163(h)(2)(F), Congress refers to section 221 for a definition of interest on educational loans.

Congress also provided some indication of what constitutes interest "properly allocable" to trade or business in section 469(e), relating to the passive activity loss rules. The meaning of "properly allocable" may be determined  by looking at adjoining words and phrases. Simmons v. United States, 308 F.2d 938, 943-944 (5th Cir. 1962). Sections 469(e)(1)(A)(i)(II) and (III) provide:

Sec. 469(e) Special Rules for Determining Income or Loss From a Passive Activity.--For purposes of this section--

                (1) Certain income not treated as income from

passive activity.-- In determining the income or loss from any activity.--

(A) In general.-- There shall not be taken into account--

(i) any-

\*  \*  \*  \*  \*  \*  \*

(II) expenses (other than interest) which are clearly and directly allocable to such gross income, and

(III) interest expense properly allocable to such gross income \* \* \*

In 1986, section 469(e) was enacted concurrently with section 163(h)(2)(A).  As originally enacted, section 163(h)(2)(A) read "incurred or continued in connection with the conduct of" and was changed in 1988 to "properly allocable".[1] This was done in an effort to harmonize section 163(h)(2)(A) with section 469(e).

When Congress enacted section 469(e) and later amended section 163(h)(2)(A), it had the opportunity to place limits on the relationship that an interest expense must bear to the conduct of an active trade or business.  Congress explicitly limited the "clearly and directly allocable" standard to business expenses and the "properly allocable" standard to interest expenses.  It reasonably can be inferred that "clearly and

---

[1]    The Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, sec. 1005(c)(4), 102 Stat. 3342, 3390, H. Rept. 100-795, at 33-37 (1988).

directly allocable" is more restrictive than "properly allocable". Congress could have used the same standard, "clearly and directly" in sections 469(e) and 163(h)(2)(A), yet, instead, used the "properly allocable" standard for section 163(h)(2)(A).

Case law prior to the enactment of section 163(h)(2)(A) defined the nexus between an interest expense and a trade or business. An interest expense arising from a deficiency related to a trade or business was treated like other business expenses and could be deducted by a sole proprietorship. Standing v. Commissioner, 28 T.C. 789 (1957, affd. 259 F.2d 450 (4th Cir. 1958); see Polk v. Commissioner, 31 T.C. 412 (1958), affd. 276 F.2d 601 (10th Cir. 1960); see also Reise v. Commissioner, 35 T.C. 571 (1961), affd. 299 F.2d 380 (7th Cir. 1962). The above cases relied on sections 22(n)(1), 23(a)(1)(A) and 122(d)(5) of the Internal Revenue Code of 1939. This definition comports with the holding in United States v. Gilmore, 372 U.S. 39, 49 (1963), which provided that the relevant inquiry is whether "the origin and character of the claim with respect to which an expense was incurred * * * is the controlling basic test of whether the expense was 'business' or 'personal'* * *". Id.

Congress is considered to be aware of these cases and the decisions existing before enactment of legislation. Dresser Indus. v. United States, 238 F.3d 603 (5th Cir. 2001). Congress is considered to be aware of "all pertinent judgments by our

branch." United States v. Barlow, 41 F.3d 935, 943 (5th Cir. 1994). Thus, Congress is considered to have been aware of Standing, Polk, and Reise when enacting section 163(h)(2)(A).

The majority contends that Standing, Polk, and Reise were rendered ineffective by the passage of section 163(h)(2)(A) because section 163(h)(2)(A) is different from the statutes on which the holdings of those cases were based, and thus this change in language indicates a change in the meaning of the statute. Majority op. p. 29 (citing Russello v. United States, 464 U.S. 16 (1983)). However, it is well settled that when Congress seeks to overturn prior case law, it must do so in an explicit manner; an implicit inference to change the status quo is impermissible. Bush v. Oceans Intl., 621 F.2d 207 (5th Cir. 1980), see Sea-Land Serv., Inc. v. United States, 874 F.2d 169, 172-173 (3d Cir. 1989). Where Congress intends to overturn prior law, it must do so in "clear, unmistakable, and unarguable language." United States v. Singleton, 165 F.3d 1297, 1302 (10th Cir. 1999). Conference committee reports are valuable in determining if Congress intended to overturn prior law, Sea-Land Serv., Inc. v. United States, supra; see United States v. Edwards, 23 F.2d 477 (8th Cir. 1927).

Congress did not express any intention to overturn Standing, Polk, and Reise, in the conference committee reports or elsewhere in the legislative history of the Tax Reform Act of 1986 (1986

TRA), Pub. L. 99-514, sec. 501, 100 Stat. 2233. Standing, Polk, and Reise, were based on statutory language which permitted a deduction for interest if it arose "in carrying on a trade or business" and "attributable to" the taxpayer's trade or business. See secs. 23(a)(1)(A), 22(n), and 122(d)(5) of the Internal Revenue Code of 1939. The majority argues that this language is different from the language "interest paid or accrued on indebtedness incurred or continued in connection with the conduct of a trade or business" and the Technical and Miscellaneous Revenue Act of 1988 (1988 TAMRA), Pub. L. 100-647, sec. 1005(c)(4), 102 Stat. 3390, language, and because of this difference, the sections have a different meaning.

In Russello, the Supreme Court analyzed the substantive differences between the two provisions in question. Russello v. United States, supra at 22-24 (examining the substantive changes and history of 18 U.S.C. sec. 1963(a)(1) (1970), the Racketeer Influenced Corrupt Organization statute). In Russello, the Supreme Court determined that Congress expanded a provision beyond its original scope. Id. The majority has not engaged in such an analysis. Additionally, the Supreme Court was construing language in the same statute in Russello; whereas, in the instant case, there are several statutes in question.

Moreover, it is not necessarily clear that the pre-1986 TRA language is substantively different from the 1986 TRA language

and the 1988 TAMRA language.  The argument that a simple change indicates a different meaning seems to fail in the context of 1986 TRA and 1998 TAMRA, where Congress replaced "interest paid or accrued on indebtedness incurred or continued in connection with the conduct of a trade or business" in section 163(h)(2)(A) with "properly allocable".  The 1988 TAMRA conference committee report does not indicate an intent to change the meaning or reach of section 163(h)(2)(A).  However, reverting to the plain meaning of these two phrases, it is reasonable to assert that they have the same meaning even though the language is different.  The same should be true for the pre-1986 TRA language.

The majority concludes that the language of section 163(h)(2)(A) is ambiguous, which requires an examination of the legislative history of the section 163(h)(2)(A), as mandated by Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837 (1984).

The Joint Statement of Managers of the Conference Report, H. Conf. Rept. 99-841, at II-151 to II-154 (1986), 1986-3 C.B. (Vol. 4) 154, published September 18, 1986 (Conference Committee Report), provides:

> Under the conference agreement, personal interest is not deductible.  Personal interest is any interest, other than interest incurred or continued in connection with the conduct of a  trade or business (other than the trade or business of performing services as a employee), investment interest, or interest taken into account in computing the taxpayer's income of loss from passive activities for the year.  Personal interest also generally includes interest on tax deficiencies.

The majority argues that the use of the term "deficiencies" in the Conference Committee Report may be unclear and that "generally" only excludes certain types of estate taxes from "personal interest". Majority op. pp. 33-34. The effect of these arguments is to restrain the force of the Conference Committee Report in determining the reach of what is "properly allocable" to a trade or business.

The term deficiency means "the amount by which the income, gift, or estate tax due under the law exceeds the amount of such tax shown on the return." Bregin v. Commissioner, 74 T.C. 1097, 1101-1102 (1980). The plain language of the Conference Committee Report supports petitioners because it excepts from personal interest "interest incurred or continued in connection with the conduct of a trade or business." H. Conf. Rept. 99-841, at II-154, supra, 1986-3 C.B. (Vol. 4) at 154. The interest was incurred as a result of a tax deficiency arising from the operation of a sole proprietorship. The final sentence in the above passage does not detract from this reading. "Generally" is defined as "in disregard of specific instances and with regard to an overall picture." Webster's Tenth Collegiate Dictionary 485 (1998). The use of the term "generally" indicates that the conference committee understood that personal interest usually includes interest on tax deficiencies; however, there are exceptions to this rule. A reasonable inference would be that

interest on tax deficiencies arising from a sole proprietorship are not within personal interest because the previous sentence excepted that class of interest from "personal interest". If the conference committee intended all interest on deficiencies to be included in personal interest, then the conference committee could have left the word "generally" out of the last sentence, so that personal interest would cover all interest on deficiencies.

The majority holds that the Conference Committee Report is not clear and accordingly justifies its reliance on the Joint Committee on Taxation General Explanation of the Tax Reform Act of 1986, pp. 262-264, 266, published May 4, 1987 (Blue Book). Majority op. p. 35. The majority argues that the confusion is further exacerbated because the Blue Book provides that interest on a tax deficiency relating to a sole proprietorship is considered personal interest. The majority goes too far in rejecting the Conference Committee Report in favor of the Blue Book.

In upholding the validity of section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., supra, and refusing to follow Redlark v. Commissioner, 106 T.C. 31 (1996), the majority provides:

> As applied to the instant case, section 1.163-9T(b)(2)(I)(A), Temporary Income Tax Regs., supra, treats petitioners' payment of interest as nondeductible "personal interest". The text of section 163(h)(2)(A) does not compel this result. The relevant legislative history, however, lends some support to this interpretation of the statute. [Majority op. pp. 47-48.]

The "legislative history" the majority relies on is the material contained in the Blue Book and in the Joint Committee on Taxation, Summary of Conference Agreement on H.R. 3838 (Tax Reform Act of 1986) (JCS-16-86), August 29, 1986 (Staff Summary). The Blue Book was published by congressional staff after the enactment of 1986 TRA. The majority argues the Staff Summary, which was produced before 1986 TRA was enacted, corroborates assertions made in the Blue Book regarding personal interest.

Such reliance is unwarranted and contrary to precedent. A staff committee's explanation of a provision is not a statement by legislators and was not relied on by legislators when enacting the 1986 TRA because it was published in May 1987. McDonald v. Commissioner, 764 F.2d 322 (5th Cir. 1985), affg. T.C. Memo 1983-197; see Zinniel v. Commissioner, 89 T.C. 357 (1987). A staff summary explanation provided after the enactment of a provision is not legislative history. Guilzon v. Commissioner, 985 F.2d 819 (5th Cir. 1993), affg. 97 T.C. 237 (1991); see Zinniel v. Commissioner, supra. The Staff Summary explanation cannot be considered part of the legislative history because it was authored by Congressional staff, the staff of the Joint Committee on Taxation, and not by Congress. Estate of Hutchinson v. Commissioner, 765 F.2d 665 (7th Cir. 1985), affg. T.C. Memo. 1984-55. The Staff Summary, however, may be given some

deference, especially when the staff views expressed are consistent with items of legislative history. Id.

I agree with Judge Thornton's concurring opinion to the extent that he concludes that the majority's reliance on the Blue Book is misplaced. The Blue Book represents only the view of the Congressional staff; it was not approved by Congress. Furthermore, the Blue Book could not have been relied upon by Congress because it was published during the 100th Congress and the Tax Reform Act was enacted by the 99th Congress. Also, the Blue Book should not be relied on because it is inconsistent with the Conference Committee Report, which would not treat interest on a tax deficiency arising from a sole proprietorship as personal interest, whereas the Blue Book would treat such interest as personal interest.[2] Consequently, the majority's reliance on the Blue Book in validating section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., supra, must be rejected.

Section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., supra, was not promulgated as part of a legislative mandate permitting the Commissioner to write regulations. Rather, those

---

[2] The Blue Book provides: "Personal interest also includes interest on underpayments of individual Federal, State, or local income taxes notwithstanding that all or a portion of the income may have arisen in a trade or business, because such taxes are not considered derived from the conduct of a trade or business." Staff of Joint Comm. On Taxation, General Explanation of the Tax Reform Act of 1986, at 266. (J. Comm. Print 1987).

regulations were promulgated pursuant to the Commissioner's section 7805(a) general power to promulgate interpretative regulations. An interpretative regulation warrants less deference than legislative regulation. United States v. Vogel Fertilizer Co., 455 U.S. 16, 24 (1982). Congress did grant the Commissioner the power to enact legislative regulations with respect to some provisions of section 163, but not with regard to section 163(h)(2)(A).[3] The Commissioner has not promulgated permanent regulations despite the fact that this temporary regulation was first promulgated in 1987.

Finally, the majority's validation of section 1.163-9T(b)(2)(I)(A), Temporary Income Tax Regs., supra, begs a significant policy question, and that is whether Congress ever intended to deny individuals doing business through sole proprietorships the advantages they would enjoy had they engaged as a corporate form. See Redlark v. Commissioner, 106 T.C. 31, 40-41 (1996). In the year before 1986 TRA was enacted, there were 11,928,738 nonfarm sole proprietorship returns filed with the Internal Revenue Service,[4] and as of 1999, there were 17,575,643 nonfarm sole proprietorship returns filed with the

---

[3]See Judge Swift's dissent pp. 103-104 and see generally Judge Vasquez's dissent.

[4]Statistics of Income Bulletin, Vol. 20, no. 1, from table 10.—Nonfarm sole proprietorship returns: selected income statement items for specified income years, 1980-1998, Summer 2000.

Internal Revenue Service.[5]  It is difficult to imagine that Congress was not aware of the number of individuals engaged in sole proprietorships in 1986.  It is even more difficult to comprehend that Congress would deny this large segment of the business world a deduction for interest, which I believe is clearly allocable to a trade or business, without more discussion in the legislative history, or at least a clear directive to the Commissioner to effect such a policy.  To permit such a result is to allow the Commissioner to make an end run around the legislative powers of Congress.

For the foregoing reasons, I respectfully dissent.

SWIFT, COLVIN, LARO, and VASQUEZ, JJ., agree with this dissenting opinion.

---

[5] Statistics of Income Bulletin, Vol. 21, no. 1, from table 1.-Nonfarm sole proprietorships: business receipts, payroll, and net income, by industrial sectors classified with the North American Industries Classification System, Summer 2001.

SWIFT, J., dissenting:  Mainly for the reasons set forth in my prior concurring opinion in Redlark v. Commissioner, 106 T.C. 31, 48-49 (1996), revd. and remanded 141 F.3d 936 (9th Cir. 1998), I believe petitioners' income tax deficiency interest should be regarded as properly allocable to petitioners' business under section 163(h)(2)(A) and as deductible under section 163(a).

None of the five Courts of Appeals' opinions cited by the majority, or the instant majority opinion, persuades me to the contrary.  Within the jurisdictions of the other seven geographic Courts of Appeals, taxpayers still are entitled to rely on our Court-reviewed Redlark opinion, and that is exactly what Mr. and Mrs. Robinson have done.  Lardas v. Commissioner, 99 T.C. 490, 495 (1992).

Two separate but related facts in this case are clear and undisputed:  (1) Under the express and clear language of section 163(h)(2)(A), if an interest expense is "properly allocable" to a trade or business, the interest expense is deductible; and (2) the tax adjustments giving rise to petitioners' 1987 tax deficiency arose directly from and in connection with petitioners' law business.  Accordingly, some portion of the related interest expense should be allocable to the business and should be deductible.

Under respondent's "temporary" regulation, section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., 52 Fed. Reg. 48409

(Dec. 22, 1987), outstanding now for 15 years, petitioners' interest expense is nondeductible regardless of the fact that it was incurred by petitioners in connection with the business. Respondent's temporary regulation and position herein should be rejected as an erroneous attempt to redefine the substantive provision of section 163(h)(2)(A).

Respondent's temporary regulation may provide reasonable methods for allocating interest between a taxpayer's business and a taxpayer's other activities, but if there is no question as to what an item of interest expense relates to, then the statute is clear and requires an allocation between the business and the nonbusiness portions thereof, and the portion allocable to the taxpayer's business is to be allowed as a deduction. Respondent's temporary regulation, in a situation involving a sole proprietorship trade or business and a related income tax deficiency, improperly and contrary to the statute, establishes a per se interest expense disallowance rule and would leave no interest expense to be allocated.

Respondent's temporary regulation is also inconsistent with section 1.163-9T(b)(1)(i), Temporary Income Tax Regs., 52 Fed. Reg. 48409 (Dec. 22, 1987), and with the allocation rule provided in the sister regulation relating to situations where no loan proceeds are involved in an underlying transaction or activity (namely, where a seller or provider of goods or services provides financing to a taxpayer or where a transaction involves interest

expense associated with a mere extension of credit, not a

provision of funds).  Section 1.163-8T(c)(3)(ii), Temporary

Income Tax Regs., 52 Fed. Reg. 25001 (July 2, 1987), provides as

follows:

> If a taxpayer incurs or assumes a debt in consideration
> for the sale or use of property, for services, or for
> any other purpose, or takes property subject to a debt,
> and no debt proceeds are disbursed to the taxpayer, the
> debt is treated for purposes of this section as if the
> taxpayer used an amount of the debt proceeds equal to
> the balance of the debt outstanding at such time to
> make an expenditure for such property, services, or
> other purpose.  [Emphasis added.]

The above temporary regulation provides that in the

situations (and for any purpose) where financing and credit

transactions do not involve the disbursement of loan proceeds but

do involve the extension of credit, interest expense relating to

the extension of credit is to be allocated between the taxpayer's

business and personal activity based on the nature of the

underlying activity giving rise to the extension of credit.

Under section 1.163-8T(c)(3)(ii), Temporary Income Tax

Regs., supra, as applicable to the instant case, even though no

loan proceeds were disbursed by the Government to petitioners,

credit was extended by the Government to petitioners, and

petitioners were charged interest with regard thereto.

Because the underlying activity in question in this case

(giving rise to the tax deficiency and to the Government's

extension of credit to petitioners) undisputedly relates to

petitioners' business, under section 1.163-8T(c)(3)(ii), Temporary Income Tax Regs., supra, some interest expense should be treated as properly allocable to petitioners' business and as deductible under the statute.

As suggested in Judge Vasquez's dissenting opinion, in interpreting the statutory provisions in dispute herein, the occasional deference mandated by Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-843 (1984), to governmental agency interpretations of statutory language left ambiguous by Congress is not applicable.

More recently, in United States v. Mead Corp., 533 U.S. 218 (2001), the Supreme Court addressed the general and flexible standard to be used by courts in evaluating what deference, if any, should be given to agency interpretative regulations and rulings as follows:

> The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position * * *. * * * [Id. at 228; fn. refs. omitted.]

And further:

> "The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." [Id. at 228 (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).]

Consistent with the above statement quoting Skidmore, and before concluding whether the particular agency rulings involved therein (of the Environmental Protection Agency and of the U.S. Customs Service, respectively) were entitled to Chevron type deference, in both Chevron and Mead the Supreme Court reviewed the very "detailed and reasoned" historical aspects of the E.P.A. ruling (Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., supra at 865), and the many "angles" of the classification ruling procedures of the U.S. Customs Service (United States v. Mead Corp., supra at 231).[1]

In the instant case, however, with regard to respondent's promulgation of section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., 52 Fed. Reg. 48409 (Dec. 22, 1987), there is scant indication of respondent's deliberations and degree of care exercised prior to promulgation of the temporary regulation.  No history of the development of the temporary regulation is available.  No hearing was held.  No notice and comment were provided.  No proposed regulation was made available.  No history of respondent's development of the policy position reflected in the temporary regulation is available.  It appears to me that the statement in the 1987 Blue Book, discussed infra, and respondent's failed litigating position in years prior to 1986 as

_____

[1] See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, part VI at 853-859 (1984); United States v. Mead Corp., 533 U.S. 218, part B at 231-234 (2001).

to the deductibility of income tax deficiency interest relating to an individual's trade or business (see cases cited <u>infra</u> note 7) are the only historical "angles" that would support the per se disallowance rule of section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., <u>supra</u>.  That being the case, <u>Chevron</u> type deference is hardly appropriate.

Of the Courts of Appeals that have addressed the issue before us, two inappropriately treat section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., <u>supra</u>, as a legislative regulation.  See <u>Redlark v. Commissioner</u>, 141 F.3d 936, 940 (9th Cir. 1998); <u>Miller v. United States</u>, 65 F.3d 687, 690 (8th Cir. 1995).  To the contrary, where it so intends, Congress knows how to specifically delegate legislative regulatory authority with regard to tax legislation, and nowhere in section 163(h) do we find such a delegation.  For examples of such specific delegation of legislative authority within just the other subsections of section 163, see section 163(f)(2)(C) (involving interest expense on certain types of obligations that are not in registered form); section 163(i)(5) (involving interest expense on certain types of corporate debt instruments with substantial original issue discount); and section 163(l)(5) (involving interest expense on certain types of corporate indebtedness payable in the equity of the debtor).

Although upholding it, the Court of Appeals for the Seventh Circuit noted its concern with regard to the deference to be

given section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs.,

supra, as follows:

> In the absence of any confirmation that the temporary regulation has, after the fact, undergone the scrutiny that typifies a pre-adoption notice and comment period, one could argue that section 1.163-9T(b)(2)(i)(A) is entitled to no more deference than a proposed regulation. * * *
>
> Whatever questions the "temporary" nature of this regulation might raise as to the degree of deference it is owed, the parties themselves have chosen not to pursue them. * * * [Kikalos v. Commissioner, 190 F.3d 791, 796 (7th Cir. 1999), revg. T.C. Memo. 1998-92.]

With regard to the relevant legislative history relating to enactment in 1986 of subsection (h) of section 163, I submit that a reading thereof is available which has not yet been considered by the various courts addressing this issue and which: (1) Would support a plain-meaning interpretation of section 163(h)(2)(A) (allowing the deduction of individual income tax deficiency interest relating to a trade or business), and (2) which would not support respondent's per se disallowance rule.

In the Joint Statement of Managers of the Conference Report, H. Conf. Rept. 99-841 (Vol. II) at II-154 (1986), 1986-3 C.B. (Vol. 4), 1, 154, published on September 18, 1986, the following statement is made:

> Under the conference agreement, personal interest is not deductible. Personal interest is any interest, other than interest incurred or continued in connection with the conduct of a trade or business * * * Personal interest also generally includes interest on tax deficiencies. [Emphasis added.]

The emphasized language in the above quotation from the legislative history can be read to indicate that Congress in 1986 intended to carve out of the definition of personal interest all interest relating to a trade or business.  Once all trade or business interest is carved out of personal interest by the above emphasized language, the next sentence generally describing personal interest only reaches types of interest left over, but not business interest that already is carved out by the prior language.  With this reading of the legislative history, the last sentence in the above quotation (namely, "Personal interest also generally includes interest on tax deficiencies.") may be read to reach only interest on tax deficiencies not related to a taxpayer's trade or business.

Of the approximately 15 law review and journal articles pre- and post-<u>Redlark v. Commissioner</u>, 106 T.C. 31 (1996), revd. and remanded 141 F.3d 936 (9th Cir. 1998), that comment substantively on the issue before us, seven support our original <u>Redlark</u> opinion on the statutory interpretation,[2] and one supports it on

<hr>

[2] Eller, "Interest Deduction for Noncorporate Tax Deficiencies", 56 Taxn. for Acct. 209, 211 (1996); Lipton, "Redlark Reversed but Interest Deductions for Business Tax Deficiencies is Still an Open Issue", 89 J. Taxn. 24, 28 (1998); Lipton, "Divided Tax Court Allows Deduction of Interest on Tax Arising From a Trade or Business", 84 J. Taxn. 218, 222 (1996); Newmark & Englebrecht, "Courts Split on Individuals' Deficiency Interest Deduction", 62 Prac. Tax Strat. 87, 95 (1999); Raby & Raby, "Allocating Individual Tax Deficiency Interest", 70 Tax Notes 573, 575 (1996); Andreozzi, Comment, "Prohibiting the Deduction for Noncorporate Tax Deficiency Interest:  When
(continued...)

policy grounds[3].  Two articles agree with the Courts of Appeals'
reversals on the statutory interpretation.[4]  The balance of the
articles comment on the issue and the controversy but appear to
take no position one way or the other.[5]

One commentator stated:

Temp. Reg. 1.163-9T(b)(2)(i)(A) should be invalidated if it
is inconsistent with other statutes and regulations.  It
appears to be in conflict with Temp. Reg. 1.163-
8T(c)(3)(ii), which was also enacted after the Blue Book
explanation was published.  This regulation controls when no
loan proceeds are received as follows:

If a taxpayer incurs or assumes a debt in
consideration for the sale or use of property, for
services, or for any other purposes, or takes
property subject to a debt, and no debt proceeds
are disbursed to the taxpayers, the debt is
treated for purposes of this section as if the
taxpayer used an amount of the debt proceeds equal

[2](...continued)
Treasury Goes Too Far", 34 J. Marshall L. Rev. 557, 579-581
(2001); Reynolds, Comment, "Redlark v. Commissioner:  A 'Bird in
the Hand' for Noncorporate Taxpayers?", 47 Case W. Res. L. Rev.
751, 795 (1997).

[3]  Engel, "Deducting Interest on Federal Income Tax
Underpayments:  A Roadmap Through a 50-Year Quagmire", 16 Va. Tax
Rev. 237, 296-297 (1996).

[4]  Harllee, 536-2nd Tax Mgmt. (BNA), "Interest Expense
Deductions", at A-113 (1998); Popkin, "The Taxpayers' Third
Personality:  Comments on Redlark v. Commissioner", 72 Ind. L.J.
41, 61 (1996).

[5]  7 Mertens, Law of Federal Income Taxation, sec. 26:35, at
93 (2001); Banoff et al., "After Allen, Is There Substantial
Authority for Deducting Interest on Tax Deficiencies?", 90 J.
Taxn. 377 (1999); Banoff et al., "Two More Courts Reject Redlark
– Interest on Taxes Not Deductible", 91 J. Taxn. 255 (1999);
Raby, "Deducting Interest on a Form 1040 Deficiency", 67 Tax
Notes 945, 946 (1995); "Interest on Taxes Never Deductible, Ninth
Circuit Says – Redlark Reversed", 88 J. Taxn. 260 (1998).

to the balance of the debt outstanding at such time to make an expenditure for such property, services, or other purpose.

"In the case of deficiency interest, the Government essentially extends credit to a taxpayer and assesses interest for the extension of that credit. Thus, when the underlying activity which creates the deficiency relates to a taxpayer's business, the interest is 'allocable' to the business and deductible under section 163(h)(2)(A)." [Quoting Allen v. United States, 987 F. Supp. 460, 466 (D.C. N.C. 1997), revd. 173 F.3d 533 (4th Cir. 1999).] Since Temp. Reg. 1.163-9T(b)(2)(i)(A) is in direct conflict with an earlier-enacted regulation that also covers the deductibility of deficiency interest related to a trade or business, Temp. Reg. 1.163-9T(b)(2)(i)(A) cannot be considered a reasonable interpretation of the statute. [Newmark & Englebrecht, "Courts Split on Individuals' Deficiency Interest Deduction", 62 Prac. Tax Strat. 87, 95 (1999); fn. ref. omitted.]

With regard to the Blue Book to the 1986 Act, and its peculiar origin, we noted in our original opinion, Redlark v. Commissioner, 106 T.C. at 45 n.7, as follows:

[W]e also note that the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, was enacted on Oct. 22, 1986, during the 99th Congress, whereas the General Explanation [the Blue Book] was published on May 4, 1987, during the 100th Congress. Thus, the General Explanation is not even entitled to the respect it might otherwise be accorded if it had been prepared for the Congress which enacted sec. 163(h).

See also Allen v. Commissioner, 118 T.C. 1, 14-15 (2002), involving the alternative minimum tax under section 55 and commenting on the limited usefulness of the Blue Book applicable to the 1986 Act. Further with regard to the Blue Book, see the concurring opinion herein of Judge Thornton.

With regard to the legal context or climate which existed in 1986, at the time subsection (h) of section 163 was added to the Code, another commentator has stated:

> The problem with the dissent's reasoning [in our Redlark opinion, 106 T.C. 31] is that, like the Eighth Circuit [in Miller v. United States, 65 F.3d 687, 689-690 (8th Cir. 1995)], it assumes that the statute is unclear.  This assumption is based on the fact that section 163(h)(2)(A) defines personal interest by excluding business interest without providing a specific definition for business interest.  The Eighth Circuit in Miller held that the absence of a definition of "business interest" created the ambiguity on which the IRS could hang its hat.

> As the Tax Court's decision illustrates, however, Congress does not legislate in a vacuum.  Under the prior case law, the interest on an income tax deficiency resulting from an adjustment involving a trade or business was treated as interest incurred in a trade or business.  If Congress is deemed to have been aware of the law at the time it enacted Section 163(h)(2)(A), there was no ambiguity in the statutory language.  [Lipton, "Divided Tax Court Allows Deduction of Interest on Tax Arising From a Trade or Business", 84 J. Taxn. 218, 222 (1996).]

Lastly, as I read it, the legislative history relating to the 1986 and the 1988 relevant legislative changes to section 163 shows that Congress, in disallowing personal interest, was addressing "consumer" interest, not interest that was specifically attributable to a taxpayer's trade or business.

In sum, section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., 52 Fed. Reg. 48409 (Dec. 22, 1987), is only interpretative.  After 15 years, it is still in temporary form.[6]

---

[6]  Since Nov. 20, 1988, temporary regulations promulgated
(continued...)

Taking into account "all those factors" that bear upon its persuasiveness (see the above quotation from United States v. Mead Corp., 533 U.S. 218, 228 (2001)), namely--

(1) The unambiguous statutory language of section 163(h)(2)(A) under which all interest expense properly allocable to a trade or business is deductible;

(2) The relevant legislative history;

(3) The case law existing at the time section 163(h) was enacted in 1986 that allowed a deduction for income tax deficiency interest relating to a taxpayer's business;[7]

(4) The language of section 1.163-9T(b)(1)(i) Temporary Income Tax Regs., supra, and the language of section 1.163-8T(c)(3)(ii), Temporary Income Tax Regs., supra,[8] both of which would support an allocation and the deduction of an individual taxpayer's trade or business related income tax deficiency interest; and

(5) The lack of any indication that Treasury or respondent, prior to promulgation of section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., supra, under which a per se disallowance rule was adopted affecting thousands of individual taxpayers[9], gave any significant policy consideration to the question of statutory interpretation at issue herein;

---

[6](...continued)
thereafter automatically sunset after 3 years.  Sec. 7805(e).

[7]  See Reise v. Commissioner, 35 T.C. 571 (1961), affd. 299 F.2d 380 (7th Cir. 1962); Polk v. Commissioner, 31 T.C. 412 (1958), affd. 276 F.2d 601 (10th Cir. 1960); Standing v. Commissioner, 28 T.C. 789 (1957), affd. 259 F.2d 450 (4th Cir. 1958).

[8]  Note that sec. 1.163-8T(c)(3)(ii), Temporary Income Tax Regs., was promulgated on July 2, 1987, 52 Fed. Reg. 25001 (July 2, 1987), prior to promulgation on Dec. 22, 1987 of sec. 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., 52 Fed. Reg. 48409 (Dec. 22, 1987).

[9]  See the dissenting opinion of Chief Judge Wells.

section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., <u>supra</u>, is entitled to little, if any, deference.  It is not persuasive, and it should be rejected.

Respectfully, in my opinion, petitioners' business-related income tax deficiency interest should be deductible.

WELLS, COLVIN, LARO, and VASQUEZ, <u>JJ</u>., agree with this dissenting opinion.

VASQUEZ, J., dissenting:  The majority has failed to convince me that we should not abide by our previous holding in Redlark v. Commissioner, 106 T.C. 31 (1996), revd. and remanded 141 F.3d 936 (9th Cir. 1998).  I continue to agree that section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., 52 Fed. Reg. 48409 (Dec. 22, 1987) (the 9T regulation), is invalid for the reasons stated in the majority and concurring opinions in Redlark.  I write separately, however, to address the appropriate standard of review applicable to the case at bar in light of the U.S. Supreme Court's opinion in United States v. Mead Corp., 533 U.S. 218 (2001), and the various Courts of Appeals' opinions-- including the Fifth, Seventh, Eighth, Ninth, and District of Columbia Circuit opinions--addressing Mead.

I.   Mead

In Mead, the U.S. Supreme Court clarified the limits of deference pursuant to Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984), owed to an agency's interpretation of a statute it administers.  The Court held that an agency's interpretation of a particular statutory provision qualifies for Chevron deference when (1) Congress delegated authority to the agency to make rules carrying the force of law, and (2) the agency interpretation claiming deference was promulgated in the exercise of that authority.  United States v. Mead Corp., supra at 226-227.  Thus, the delegation of authority by Congress to the agency is insufficient in and of itself to

entitle the agency implementation to <u>Chevron</u> deference; the agency must also actually invoke the authority delegated. <u>Id.</u> at 226-227, 237.

The Court clarified <u>Chevron</u> by stating that the delegation of authority may be either explicit or implicit, and when <u>Chevron</u> deference applies, a reviewing court is obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable. <u>Id.</u> at 227, 229. Thus, any regulation entitled to <u>Chevron</u> deference is binding on the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute. <u>Id.</u> at 227.

Precedential value alone, however, does not add up to <u>Chevron</u> entitlement; interpretive rules sometimes may function as precedents, and they enjoy no <u>Chevron</u> status as a class. <u>Id.</u> at 232. Although not limiting <u>Chevron</u> deference to situations where notice-and-comment rulemaking or formal adjudications took place, the Court focused on these attributes and stated they are significant in determining whether Congress contemplated administrative action with the effect of law and whether <u>Chevron</u> deference is appropriate.[1] <u>Id.</u> at 230, 231, 233, 234.

---

[1] The Court cites numerous cases where notice-and-comment rulemaking took place, but only one where it did not, and <u>Chevron</u> deference was accorded. <u>United States v. Mead Corp.</u>, 533 U.S. 218, 230 n.12, 231 n.13 (2001).

When an agency's interpretation of a particular statutory provision does not qualify for <u>Chevron</u> deference, it still may merit some deference pursuant to <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944).  <u>United States v. Mead Corp.</u>, <u>supra</u> at 234-235, 237.  Pursuant to <u>Skidmore</u>, the agency's interpretation would be accorded respect proportional to its "power to persuade".  <u>Id.</u> at 235.

## II.  <u>Chronology of the Case Law Pre-Mead</u>

### A.  <u>Miller--Eighth Circuit</u>

The U.S. Court of Appeals for the Eighth Circuit was the first Court of Appeals to address the validity of the 9T regulation.  <u>Miller v. United States</u>, 65 F.3d 687 (8th Cir. 1995).  The Court of Appeals for the Eighth Circuit relied on <u>Chevron</u> to determine the validity of the 9T regulation.  <u>Id.</u> at 689.  The court did not state that section 163(h)(2)(A) was ambiguous; instead, it concluded that Congress failed to define what constitutes "business interest"[2] in the statute, and this was an implicit legislative delegation of authority to the Commissioner.  <u>Id.</u> at 690.  But see Judge Swift's dissent p. 104. The court then relied on The General Explanation of the Tax Reform Act of 1986 (Blue Book) issued by the staff of the Joint Committee on Taxation to conclude that the 9T regulation was a permissible construction of the statute.  <u>Id.</u> at 690-691.

---

[2]  It is unclear why the court chose to focus on "business interest" rather than "personal interest".

B.  Redlark

1.  Tax Court

In Redlark, we noted that the 9T regulation was an interpretive, rather than a legislative, regulation.  Redlark v. Commissioner, 106 T.C. at 38.  We respectfully disagreed with the Court of Appeals for the Eighth Circuit's conclusion and held that the 9T regulation was unreasonable and an impermissible reading of the statute.  Id. at 47.

In dissent, Judge Halpern stated that in the absence of temporary regulations a reasonable interpretation of section 163(h)(2)(A) would include the interest here in question and that deficiency interest attributable to nonemployee trade or business income is not personal interest.  Id. at 65 (Halpern, J., dissenting).  In his view, however, we should have upheld the 9T regulation as valid as it was entitled to Chevron deference.  Id. at 66 (Halpern, J., dissenting).

2.  Ninth Circuit

The U.S. Court of Appeals for the Ninth Circuit, agreeing with the Eighth Circuit, reversed.  Redlark v. Commissioner, 141 F.3d at 938, 941.  The Court of Appeals for the Ninth Circuit, like that of the Eighth Circuit, also treated the 9T regulation as a legislative regulation.  Id. at 940.  The court gave the 9T regulation Chevron deference and stated that the issue was whether the 9T regulation was a permissible interpretation of section 163(h).  Id. at 938.  The Court of Appeals for the Ninth

Circuit acknowledged that it was reasonable that income tax deficiencies should properly be considered allocable to their business. Id. at 939. The court, however, applied Chevron and, like the Eighth Circuit, relied on the Blue Book to conclude that the 9T regulation was a permissible construction of the statute. Id. at 939, 941.

C.    Allen--Fourth Circuit

The U.S. Court of Appeals for the Fourth Circuit concluded that section 163(h) was ambiguous. Allen v. United States, 173 F.3d 533, 534 (4th Cir. 1999). It based this conclusion on "the absence of a statutory directive" as to the meaning of "properly allocable" and the fact that there were "sharply divergent opinions" in Redlark.[3] Id. at 536. The court applied Chevron and accorded the 9T regulation Chevron deference. Id. at 537. The Court of Appeals for the Fourth Circuit also relied on the Blue Book to conclude that the 9T regulation was a permissible construction of the statute. Id. at 537-538.

D.    McDonnell--Sixth Circuit

The U.S. Court of Appeals for the Sixth Circuit, without analysis, simply relied on the analysis of the Court of Appeals for the Ninth Circuit in Redlark. McDonnell v. United States, 180 F.3d 721, 723 (6th Cir. 1999).

---

[3] This suggests that every time a statute fails to define a word or term, or any time judges disagree regarding the meaning of a word or phrase in a statute, the statute is automatically ambiguous.

E.    Kikalos--Seventh Circuit

The U.S. Court of Appeals for the Seventh Circuit acknowledged that the 9T regulation is an interpretive regulation.  Kikalos v. Commissioner, 190 F.3d 791, 795 (7th Cir. 1999), revg. T.C. Memo. 1998-92 (which relied on our opinion in Redlark).  The Court of Appeals for the Seventh Circuit stated that "interpretive regulations of this sort, when subject to a notice-and-comment procedure, are reviewed deferentially, under the criteria articulated in" Chevron and its progeny.  Id.  The court noted that the 9T regulation did not go through notice-and-comment and that such a regulation might be entitled to no more deference than a proposed regulation.[4]  Id. at 796.  The Court of Appeals for the Seventh Circuit, however, left for another day what deference a regulation of this sort is due because the parties assumed Chevron deference applied.  Id.  Therefore, the court accorded the 9T regulation Chevron deference.  Id.

The Court of Appeals for the Seventh Circuit acknowledged that in light of the cases predating the Tax Reform Act of 1986 (TRA 1986), Pub. L. 99-514, 100 Stat. 2085, one could argue with some force that where an income tax deficiency results from a taxpayer's trade or business the interest accrued on that deficiency should be allocable to the trade or business.  Id. at

---

[4]  Proposed regulations are generally not afforded any more weight than that of the position advanced by the Commissioner on brief.  Gen. Dynamics Corp. v. Commissioner, 108 T.C. 107, 120 (1997); Laglia v. Commissioner, 88 T.C. 894, 897 (1987).

797-798. Based on the Blue Book and the deference to be accorded under Chevron, however, the court upheld the validity of the regulation. Id.

    F.   Summary of the Cases

Thus, all five of the Courts of Appeals accorded the 9T regulation Chevron deference.

III.  Post-Mead Case Law

In the years that have passed since the U.S. Courts of Appeals issued their opinions regarding the 9T regulation, principles of law have developed regarding the Chevron doctrine. See supra, part I. The U.S. Court of Appeals for the Fifth Circuit, the circuit to which appeal in the instant case lies, has stated: "Mead clarified that Chevron's expansive conception of judicial deference to an administrative agency's legal interpretation applies only when 'Congress delegated authority to the agency generally to make rules carrying the force of law, and * * * the agency interpretation claiming deference was promulgated in the exercise of that authority.'" Pool Co. v. Cooper, 274 F.3d 173, 177 n.3 (5th Cir. 2001). In the absence of Chevron deference, pursuant to Mead, the agency's interpretation is accorded respect under Skidmore according to its "power to persuade". Id. at 177; see also Landmark Legal Found. v. IRS, 267 F.3d 1132, 1135-1136 (D.C. Cir. 2001) (when Chevron deference does not apply, the IRS's interpretations are entitled to "no more than the weight derived from their 'power to persuade.'").

In light of <u>Mead</u>, <u>Chevron</u> deference is reserved for only those agency interpretations reached through notice-and-comment or comparable formal administrative procedures. <u>Ind. Family &</u> <u>Soc. Servs. Admin. v. Thompson</u>, 286 F.3d 476, 480 (7th Cir. 2002); <u>TeamBank, N.A. v. McClure</u>, 279 F.3d 614, 619 (8th Cir. 2002); <u>U.S. Freightways Corp. v. Commissioner</u>, 270 F.3d 1137, 1141 (7th Cir. 2001) (involving the Commissioner of Internal Revenue), revg. 113 T.C. 329 (1999). While the Supreme Court left open the possibility that <u>Chevron</u> deference may be appropriate in instances similar to notice-and-comment rulemaking or formal adjudication, it did not clearly outline these instances.[5] <u>Matz v. Household Intl. Tax Reduction Inv. Plan</u>, 265 F.3d 572, 574 (7th Cir. 2001). Agency interpretations that are not the result of such formal administrative procedures are entitled to the lesser deference accorded under <u>Skidmore</u>. <u>Ind.</u> <u>Family & Soc. Servs. Admin. v. Thompson</u>, <u>supra</u> at 480; <u>Teambank,</u> <u>N.A. v. McClure</u>, <u>supra</u> at 619 n.4; <u>U.S. Freightways Corp. v.</u> <u>Commissioner</u>, <u>supra</u> at 1141.

Furthermore, in applying <u>Mead</u>, "mere ambiguity in a statute is not evidence of congressional delegation of authority", agency authority is not to be lightly presumed, and courts should not

---

[5] "Only when agencies act through 'adjudication[,] notice-and-comment rulemaking, or * * * some other [procedure] indicat[ing] comparable congressional intent [whatever that means]' is <u>Chevron</u> deference applicable * * * ." <u>United States</u> <u>v. Mead Corp.</u>, <u>supra</u> at 240 (Scalia, J., dissenting).

presume a delegation of power based solely on the fact that there was not an express withholding of such power.  <u>Mich. v. EPA</u>, 268 F.3d 1075, 1082 & n.2 (D.C. Cir. 2001).

The fact that a court pre-<u>Mead</u> found the agency's position to be reasonable under the <u>Chevron</u> standard is insufficient; after <u>Mead</u>, if <u>Chevron</u> is inapplicable the agency's position must be persuasive.  <u>Matz v. Household Intl. Tax Reduction Inv. Plan</u>, <u>supra</u> at 573-575 (applying this rule to the IRS).  It is "plain error for [courts] to rely on" <u>Chevron</u> in determining what deference to give agency actions without considering <u>Mead</u>.  <u>Am. Fedn. of Govt. Employees, AFL-CIO v. Veneman</u>, 284 F.3d 125, 129 (D.C. Cir. 2002).  To the extent decisions using a pre-<u>Mead</u> analysis differ from the analysis set forth in <u>Mead</u>, <u>Mead</u> controls.  <u>Hall v. U.S. EPA</u>, 273 F.3d 1146, 1156 n.6 (9th Cir. 2001).

IV.  <u>Applying Mead to This Case</u>

I note that "<u>Chevron</u> has had a checkered career in the tax arena."  <u>Cent. Pa. Sav. Association v. Commissioner</u>, 104 T.C. 384, 391 (1995). "The degree to which courts are bound by agency interpretations of law has been like quicksand.  The standard seems to have been constantly shifting, steadily sinking, and, from the perspective of the intermediate appellate courts, frustrating."  <u>Wolpaw v. Commissioner</u>, 47 F.3d 787, 790 (6th Cir. 1995), revg. T.C. Memo. 1993-322.

We have previously avoided, pre-<u>Mead</u>, the question of whether temporary regulations promulgated without notice-and-comment procedures are entitled to <u>Chevron</u> deference. <u>UnionBanCal Corp. v. Commissioner</u>, 113 T.C. 309, 316-317 (1999). We also have previously questioned, pre-<u>Mead</u>, whether <u>Chevron</u> applies to interpretive regulations. <u>Cent. Pa. Sav. Association v. Commissioner</u>, <u>supra</u> at 391 (citing <u>E.I. duPont de Nemours & Co. v. Commissioner</u>, 41 F.3d 130 (3d Cir. 1994), affg. 102 T.C. 1 (1994)). The question of what deference interpretive regulations, including temporary regulations issued without notice-and-comment procedures, are entitled needs to be answered in light of <u>Mead</u>.

The first question in the <u>Mead</u> analysis is whether Congress delegated authority to the agency to make rules carrying the force and effect of law. <u>United States v. Mead Corp.</u>, <u>supra</u> at 226-227; <u>Pool Co. v. Cooper</u>, <u>supra</u> at 177 n.3. The second question is whether the agency invoked that authority. <u>United States v. Mead Corp.</u>, <u>supra</u>; <u>Pool Co. v. Cooper</u>, <u>supra</u>. In this case, however, even assuming that we were to answer the first question in the affirmative, we must answer the second question--whether the agency invoked the authority delegated--in the negative for the reasons set forth below.

Regulations are either legislative or interpretive in character. <u>Tutor-Saliba Corp. v. Commissioner</u>, 115 T.C. 1, 7 (2000). Interpretive regulations are promulgated under the

general authority vested in the Secretary by section 7805, whereas legislative regulations are issued pursuant to a specific congressional delegation to the Secretary.  Id.; Hefti v. Commissioner, 97 T.C. 180, 189 (1991), affd. 983 F.2d 868 (8th Cir. 1993).  "An interpretive regulation may be contrasted to a legislative regulation, one which is mandated specifically in the statute and has the force and effect of law."  Matheson v. Commissioner, 74 T.C. 836, 840 n.7 (1980).

In Redlark v. Commissioner, 106 T.C. at 38, we stated:

> The regulations involved herein were promulgated pursuant to the general authority granted to the Secretary of the Treasury by section 7805(a) and not pursuant to specific legislative authority, T.D. 8168, 1988-1 C.B. 80, 83; they are therefore interpretive.

The majority opinion in this case agrees with this conclusion, and the Commissioner concedes that the 9T regulation is an interpretive regulation.  Majority op. p. 40.  As such, even if the statute were ambiguous, but see Chief Judge Wells's dissent, and assuming Congress delegated authority to the IRS to make rules carrying the force and effect of law in this area, but see Judge Swift's dissent p. 104, it appears that by choosing to issue the 9T regulation pursuant to section 7805 the Commissioner did not issue the 9T regulation pursuant to a specific congressional delegation authority having the force and effect of law.  See Tutor-Saliba Corp. v. Commissioner, supra at 7; Matheson v. Commissioner, supra at 840 n.7.  Thus, the 9T regulation is not entitled to Chevron deference; it is only

entitled to <u>Skidmore</u> deference.[6]  <u>United States v. Mead Corp.</u>,
<u>supra</u> at 234-235; <u>Pool Co. v. Cooper</u>, <u>supra</u> at 177.

V.    <u>The Majority Opinion</u>

The majority relies on the pre-<u>Mead</u> opinions of the U.S.
Courts of Appeals for the Fourth, Sixth, Seventh, Eighth and
Ninth Circuits to support its conclusion that the 9T regulation
is valid.  Majority op. pp. 10-13.  This is wrong, as these cases
were all decided pre-<u>Mead</u>.  <u>Am. Fedn. of Govt. Employees, AFL-CIO
v. Veneman</u>, <u>supra</u> at 129; <u>Hall v. U.S. EPA</u>, <u>supra</u> at 1156 n.6;
<u>Matz v. Household Intl. Tax Reduction Inv. Plan</u>, <u>supra</u> at 575.

In judging the validity of the 9T regulation, the majority
accords an interpretive regulation "considerable weight", states
that it will uphold interpretive regulations if they implement
the congressional mandate in some reasonable manner, applies the
pre-<u>Mead</u> analysis, and gives the 9T regulation <u>Chevron</u> deference.
Majority op. pp. 40-41, 43, 51-52.  In light of <u>Mead</u>, this
analysis is improper.

Additionally, as is pointed out by Judge Thornton in his
concurring opinion, the majority relies on the Joint Committee

---

[6]  It also appears that the 9T regulation is not entitled to
<u>Chevron</u> deference for another reason:  The 9T regulation did not
go through notice-and-comment, there is no evidence that it went
through comparable formal administrative procedures, and it
remains in temporary form 15 years later.  <u>Ind. Family & Soc.
Servs. Admin. v. Thompson</u>, 286 F.3d 476, 480 (7th Cir. 2002);
<u>TeamBank, N.A. v. McClure</u>, 279 F.3d 614, 619 (8th Cir. 2002);
<u>U.S. Freightways Corp. v. Commissioner</u>, 270 F.3d 1137, 1141 (7th
Cir. 2001), revg. 113 T.C. 329 (1999); <u>Kikalos v. Commissioner</u>,
190 F.3d 791, 796 (7th Cir. 1999), revg. T.C. Memo. 1998-92.

staff summary (even though the conference committee chose to adopt language less restrictive than the staff summary) and on the Blue Book (even though the Blue Book goes far beyond the language of the conference committee report to insert ideas from the staff summary that it previously suggested to the conference committee, but which the conference committee rejected and even though the Blue Book was published during the 100th Congress while TRA 1986 was enacted during the 99th Congress).  Majority op. pp. 17-18, 35.  For the reasons stated in Judge Thornton's concurring opinion, our opinion in Redlark, and Judge Laro's concurring opinion in Redlark, I find this reliance unpersuasive. See also Judge Swift's dissent p. 108.

The majority acknowledges that section 163(h)(2)(A) does not compel the result contained in the 9T regulation but relies on the Joint Committee staff summary and Blue Book to conclude the 9T regulation is a permissible construction.  Majority op. pp. 47-52.  This would be a slender reed on which to conclude that the 9T regulation has the power to persuade and is entitled to deference under Skidmore v. Swift & Co., supra, especially in light of the acknowledgment that a reasonable interpretation of section 163(h)(2)(A) is that income tax deficiency interest attributable to nonemployee trade or business income should properly be considered allocable to a trade or business and that the pre-TRA 1986 case law also supports this conclusion.  Kikalos v. Commissioner, 190 F.3d at 797-798; Redlark v. Commissioner,

141 F.3d at 939; <u>Redlark v. Commissioner</u>, 106 T.C. at 65 (Halpern, J., dissenting).

Deference only sets the framework for judicial analysis; it does not displace it.  <u>United States v. Vogel Fertilizer Co.</u>, 455 U.S. 16, 24 (1982); <u>United States v. Cartwright</u>, 411 U.S. 546, 550 (1973); <u>Dresser Indus., Inc. v. Commissioner</u>, 911 F.2d 1128, 1137 (5th Cir. 1990).  The majority relies on Courts of Appeals opinions predating <u>United States v. Mead Corp.</u>, <u>supra</u>, to analyze the validity of section 1.163-9T, Temporary Income Tax Regs.  The majority's analysis is incorrect; therefore, I respectfully dissent.

WELLS, SWIFT, COLVIN, and LARO, <u>JJ</u>., agree with this dissenting opinion.